# Sparhawk *versus* The Union Passenger Railway Company:
## Kenton *versus* Same *et al.*

1. A party cannot vindicate others' rights by process in his own name, nor employ civil process to punish wrongs to the public.

2. When equity intervenes to restrain acts prejudicial to the interests of the community, it must be by bill by the attorney-general.

3. Private parties can invoke the chancery powers of the courts only for the redress of private injuries done or threatened.

4. Injury to property with reference to its reasonable use by continuous hurtful acts constitutes a nuisance, and may be the subject of equity jurisdiction, not only to redress the party by restraining the injurious acts, but in some cases to compel the wrongdoer to make amends.

5. The application for redress by injunction must establish a clear case of irreparable injury, likely to ensue from the continuance of the acts.

6. The party cannot supplement a defective case by an alleged infraction of the penal laws in the acts complained of.

7. When a private injury results from a breach of a public law, the public wrong may be redressed by the private remedy, because the private remedy stops the wrongdoer.

8. Running passenger cars on Sunday is a violation of the Act of 1794 and is within its penalties.

9. The remedy by injunction is preventive and is designed to stop acts which would work irreparable mischief; the right to such remedy must be clear, and the wrong likely to ensue distinctly established.

10. There is no case for equity, unless the charge be for injury to the enjoyment of property or other personal rights.

11. A charge of the violation of the Act of 1794 relating to Sunday which describes nothing but the consequences intended to be prevented by that act, is not a case of special injury.

4 P. F. SMITH—26

[Sparhawk *v.* Union Passenger Railway Co.]

12. Rest and quiet on the Sabbath day, with the right and privilege of public and private worship, undisturbed by any mere worldly employment, are what the statute was passed to protect, and a bill complaining of the deprivation of these privileges is essentially a bill to enforce a penal statute.

13. Equity will not restrain an act which is illegal merely.

14. The penal law to prevent worldly employment on the Sabbath has provided the machinery for punishing it, and to it the violation must be referred.

15. One reason why equity cannot interfere is that there is a remedy at law by statute, which must be presumed to be adequate.

16. A party who asks a decree which would bind his adversary must make out a clear case of, at least, preponderating equity.

17. To make out a case of special injury to property from nuisance, something materially affecting its capacity for ordinary use and enjoyment must be shown.

18. The true rule in judging of injury from nuisances is, that it be such as naturally and necessarily results to all alike who come within their influence.

19. Chancery will not enjoin acts, for which damages may not be recovered at law.

20. Noises that distress and annoy physically and may affect health, are regarded as nuisances, and the ownership of property will not justify the use of it in that way.

21. Running cars on the Sabbath is not authorized by the act of incorporation of the Union Passenger Railway Company, and is *ultra vires :* nor have the company authority to hold or execute a mail contract. Whether these acts imperil the charter can be tried only at the suit of the Commonwealth ; a stockholder may sue for an injunction, but it will not be granted when his bill is not bonâ fide, but only in aid of a private bill of other plaintiffs.

February 28th and March 1st 1867. Before WOODWARD, C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

Appeal from the Supreme Court at Nisi Prius. In Equity.

These were two bills in equity. In the first John Sparhawk and others were the plaintiffs and The Union Passenger Railway of Philadelphia the defendants. In the second, Levi Kenton was the plaintiff and the same company and Jacob Ridgway and others, directors of the company, were defendants.

The first bill set out the incorporation of the company with authority to construct a railway in Philadelphia for carrying passengers from the intersection of Wharton and Front streets along many streets of the city to the place of beginning.

The plaintiffs allege that they are citizens of Philadelphia, some of them pewholders in churches on the line of the railway and some of them owners and residents of dwelling-houses on the line of the railway ; that the company are running their cars with horse-power and carrying passengers for hire over their railway on Sunday, in violation of the laws of this Commonwealth, and to the manifest injury of the plaintiffs and many other citizens of the said city. And the said company threaten and intend to prosecute and continue the said business for hire as aforesaid, on the next Sunday and on every Sunday thereafter ; that by reason of the said unlawful business the plaintiffs have been, are and will be deprived of their right of enjoying the Sabbath, as a day of rest and of

[Sparhawk v. Union Passenger Railway Co.]

religious exercise, free of all disturbance from merely unnecessary and unauthorized worldly employment; that they have been, are and will be thereby prevented from engaging peaceably and without interruption in the worship of Almighty God in their accustomed places of public worship or in their own residences on the Sabbath day; that the lawful peace and quiet of the said day is thereby disturbed and broken; and that the rights of property which they possess in their said churches or places of public worship, and in their private residences, are and will continue to be thereby infringed upon, and their said churches and residences thereby deteriorated and lessened in value; and they prayed for an injunction to restrain The Union Passenger Railway Company of Philadelphia, the defendant, its officers and servants, from running, or permitting any cars to run over any of the streets of the city of Philadelphia on the said railway, or otherwise, upon the first day of the week, commonly called Sunday; and for further relief, &c.

In the second bill the plaintiff alleged that he was a stockholder of The Union Passenger Railway Company of Philadelphia, being the holder of five shares of the capital stock and that he brings this bill, as well for himself as for such other stockholders in said company as may desire to unite with him therein; that the defendants have recently engaged in the business of running their cars and carrying passengers for hire on and over their railway on Sunday, in violation of the laws of this Commonwealth, and propose to carry on and continue the said business on every Sunday hereafter; that the said defendants have contracted with the United States to carry mails in or through the city of Philadelphia, on and over the several streets mentioned in their act of incorporation, or on and over some of the said streets, and in pursuance thereof are carrying said mails; and that the said defendants have no lawful authority under their charter, or any law whatsoever, to enter into or carry out any such contract; that by reason of the said unlawful acts the charter of the said Union Passenger Railway Company has come to be imperilled, and the plaintiff and such other stockholders as may unite with him in this bill, are in danger of losing the value of his and their stock in said company and being otherwise injured; and prayed,

1. That it might be decreed that the acts of the defendants, in running their cars on Sunday for hire, and in entering into a contract for carrying the mails, are unlawful, and that such contract is invalid and void.

2. That an injunction may be issued, restraining the defendants, &c., from running or permitting to run any of their cars on Sunday, and from doing any act whatsoever under or by reason of any contract, or alleged contract, entered into by them, or any of them, for the carrying of the mails.

[Sparhawk *v.* Union Passenger Railway Co.]

3. Such other and further relief, &c.

Both bills were heard at Nisi Prius upon affidavits, of which a great number were taken.

On the part of the plaintiffs the witnesses testified that the running of the cars was very annoying and disturbing to them in their churches, distracting their attention, preventing them from hearing the pulpit service; attracting the attention of children in the Sabbath schools, and in their judgment rendering the pews and church property much less valuable; also that the quiet of private dwellings was broken by the running of the cars on the Sabbath; that private and family devotion was disturbed, and that the value of the dwelling-houses was much diminished.

On the part of the defendants the witnesses testified that they had not been disturbed in their churches by the running of the cars; that their running on the Sabbath is an advantage to churchgoers from distant points; that in their judgment church property was not depreciated in value, but rather enhanced by reason of the increased facilities; that many persons rode in the cars to church; that the cars did not make so much noise as carriages, and that in their judgment it was not injurious to the morals of the community, and was conducive to the health of the citizens, in affording an opportunity of recreation to those whose circumstances would not enable them to obtain it otherwise.

At Nisi Prius preliminary injunctions were granted on the following opinion by STRONG, J.:—

"Some of the complainants in the first of these bills are members of different churches, and pewholders in church buildings, situated on the line of the defendants' passenger railway in the city of Philadelphia. Others are residents in and owners of dwelling-houses, also situated on the line of the said railway. They complain that the defendants, a corporation chartered under the laws of this Commonwealth, have engaged in the business of running cars along and over their railway, with horse-power, and in carrying passengers for hire, on the first day of the week, commonly called Sunday, in violation of the laws of the Commonwealth; and that they intend to continue the said business of running the cars on the next Sunday and every Sunday hereafter. These acts of the defendants are charged in the bill to be not only unlawful, but also prejudicial to the complainants, *because* they are thereby deprived of their right to enjoy the Sabbath as a day of rest and religious exercise, free from all disturbance by unnecessary and unauthorized worldly employment; *because* they have been, are and will be thereby prevented from engaging peaceably and without interruption in the worship of Almighty God, in their accustomed places of worship, or in their own residences, on the Sabbath

[Sparhawk v. Union Passenger Railway Co.]

day ; *because* the lawful peace and quiet of the said day is thereby disturbed and broken ; and *because* their rights of property in their said churches, or places of public worship, and in their private residences, are and will continue to be infringed upon, and their churches and residences deteriorated in value. They therefore pray for an injunction to restrain the defendants from continuing to run their cars hereafter over their railway on Sundays. And they now submit affidavits and proofs, and move for a special injunction to continue until final hearing.

" The complainant in the other bill is a stockholder in the Union Passenger Railway Company. His bill charges a similar violation of law by the defendants, and its threatened continuance. It charges, in addition, that the defendants have contracted with the United States Government, or with some of the executive departments or officers thereof, to carry the mails for the United States in and through the city of Philadelphia, on and over the streets or some of them, and that in pursuance of said contract they are carrying the said mails. The bill further charges that they have no lawful authority to enter into or carry out such a contract, and that by reason of such unlawful acts the charter of the company is imperilled, and the complainant is in danger of losing the value of his stock, and being otherwise injured. He therefore asks an injunction similar to that prayed for by the complainants in the first bill, and also an injunction against any action under any contract entered into by the defendants to carry the mail. In this case also there is a motion for a preliminary injunction.

" In support of these motions a great number of affidavits have been submitted, and a very large number have likewise been presented on behalf of the defendants. Much that the affiants have sworn to has no bearing upon the real questions involved in the motions. But it is certainly established that the complainants in the first bill are pewholders and worshippers in different churches along the line of the defendants' railway, or residents and owners of dwelling-houses situated on said line, and that the defendants are engaged in running their cars over and along the said railway on the first day of the week called Sunday, and that they propose to continue so running their cars hereafter on Sunday. So far the facts are clear. They are not even disputed.

" The facts averred in the second bill are also fully made out by the proofs, and they are not contradicted.

" In considering whether injunctions ought to be granted, the first question to be met is, whether the acts of the defendants complained of and proved, are contrary to law. In regard to this I have no difficulty. The act of running cars over a passenger railway on the first day of the week, commonly called Sunday, and running them, as it was shown the defendants have done, and as they propose hereafter to do, is the performance on that day

of what is their ordinary employment or business. It is the same business as that in which they are engaged on all other days, conducted in the same manner, namely, for hire, and for the same object, which is gain. In view of the whole course of our statutory enactments, and of the decisions of this court, I do not see how it can be doubted that it is a palpable violation of law.

" Christianity is a part of the common law of this state. In saying this I utter no new doctrine. It was part of the common law of England long before this state was settled. There is a multitude of decisions to this effect to be found in the books, and it has been decided in England that it is an indictable offence at common law to write or speak of Christianity contemptuously or maliciously. The old common law of England is a part of the common law of this state. Our fathers brought it with them when they settled in the wilderness and founded this new Commonwealth. And there is abundant evidence that the purpose of William Penn and those who came under his auspices, was to found a Christian state. While the amplest provisions were made to secure liberty of conscience, and exemption from molestation for religious persuasion or practice in matters of faith and worship, there was the most unmistakable recognition of Christianity as a part of the law, both in ' the laws agreed upon in England,' on the 6th of May 1682, declared to be for ever fundamental in the government of the province, and in the ' Charter of Privileges,' granted by William Penn to the inhabitants of Pennsylvania, and declared to be unalterable by any law or ordinance, without the consent of the governor and six-sevenths of the Assembly met. Equally did the ' Great Law,' enacted at Chester, on the 7th of December 1682, proceed upon the basis that Christianity was a part of the fundamental law of the land. I do not propose to go over the argument. No one has ever yet been able to raise a respectable doubt that this part of the common law of England belongs inseparably to the institutions of this state. And even if there could have been doubt, the decisions of this court have set the matter to rest. In Updegraff *v.* The Commonwealth, 11 S. & R. 394, it was solemnly decided that Christianity is a part of our common law. In that decision all the judges of this court concurred. They were eminent judges, Tilghman, Gibson and Duncan, men whose opinions to this day command universal respect, and they fortified their judgment by an unanswerable argument.

" But if Christianity is a part of the common law, it carries with it a civil obligation to abstain on the Lord's day from all worldly labor and business, except works of necessity and mercy. Christianity without a Sabbath would be no Christianity. Hence even in England cessation of labor and business on Sunday was early recognised by the common law as obligatory to a certain extent. It is immaterial now to what extent. But William Penn

[Sparhawk v. Union Passenger Railway Co.]

and the early settlers of this Commonwealth have left us no equivocal testimony of the extent to which they regarded the observance of the Sabbath as obligatory. The laws agreed upon in England to which I have referred, ordained that every first day of the week, called the Lord's day, people should abstain from their common daily labor. And the 'Great Law' of December 7th 1682, in its first enactment, repeated substantially the injunction.

"These laws, in my opinion, were declaratory of what the common law was, as introduced into this state, and the subsequent statutes enacted in 1700, 1705, 1760, 1786 and in 1794 were all in aid of the common law. They all enjoined cessation from worldly business on the first day of the week. Their avowed purpose was to prevent vice and immorality, and, as it was sometimes asserted, to protect the inhabitants of the province and state in the undisturbed worship of God, according to the dictates of their own consciences.

"The cases I have before me, however, do not demand maintenance of the position that the acts of the defendants, of which the bills complain, are in violation of the common law. The statute of 1794 is still in force. It imposes a penalty upon any person who shall do or perform any worldly employment or business whatsoever on the Lord's day, commonly called Sunday, works of necessity and charity only excepted. There is, however, a proviso taking out of the operation of the act certain descriptions of business, or work, no one of which is the work in which the defendants are engaged. I need not spend time to prove that when a statute imposes a penalty for doing an act, it impliedly prohibits the act, makes it illegal. If, therefore, performing worldly business on Sunday were not against common law, this Act of Assembly makes it unlawful in all but the excepted cases. And the work in which the defendants are engaged, which they propose to continue, is not embraced in any of the exceptions.

"A large part of the argument before me in opposition to these motions was directed to show, if possible, that running street cars on passenger railways in this city on Sunday is a work of necessity, and therefore not in violation of the common law, and not prohibited by the Act of 1794. The argument was based upon numerous affidavits affirming that in the opinion of the affiants, running cars thus is necessary to enable persons residing at a distance from churches, as also the aged and infirm, to go to and return from the places where they are accustomed to worship; that it is necessary to accommodate physicians in making professional visits; that it is necessary to afford facilities for family and social visiting, and that it is also necessary for the health and comfort of the poor, enabling them to obtain recreation and

a change of air, by cheapening the means of conveyance to the rural districts.   Of all these, it may be said that, at most, they are conveniences for others, and not necessities of the defendants, within the meaning of the Acts of Assembly.   It is not for me, called as I am to administer the law as it is, rather than as the defendants may think it ought to be, to decide that what is but affording a facility amounts to a necessity.   The legislature has not exempted from the prohibition acts which may conduce to the convenience, or contribute to supply the necessities, of individuals, or even large portions of the people.   It must be presumed they considered what inconveniences would follow a prohibition of worldly labor on the Lord's day.   In view of them, as well as of the evils flowing from the absence of a prohibition of such labor, they enacted the statute of 1794.   Their controlling object was to protect the community against vice and immorality. This they attempted to do by declaring illegal all worldly labor and business, except works of necessity and charity.   But they did not overlook public and individual convenience.   In the proviso of the act they declared how far worldly labor might be done, not necessary to the agent, but contributing to the necessities of others.   The enumeration in the proviso of things allowed to be done, shows what was intended by excepting works of necessity from the prohibitory clause.   If it was not meant by the act to forbid work which might be a convenience or even a necessity in some sense to others than the laborer, the proviso is entirely superfluous.   It is plain, however, that when they excepted works of necessity, they meant works of necessity to him who does them, and not to others.   If this is not so, the act is without force.   There is very little, if any, worldly business that does not subserve the convenience and even the necessities of some part of the community.   Food, clothes, shelter and furniture are undoubted necessities.   But may the agriculturist justify his ordinary worldly business on Sunday by the plea that he is thereby furnishing food for the hungry ?   May the cotton-mills, woollen-mills, and clothing establishments of the country be driven, as usual, and without cessation, on the Lord's day, because they are thus contributing to provide clothing for those who need it? Is the business of the carpenter or cabinet-maker to move on through the seven days of the week, uninterruptedly and according to law, because others may need houses or furniture ?   May the chemist keep his laboratory in full operation on. Sunday, because medicines are necessary ?   All these questions, and a multitude of others of similar character, must be answered in the affirmative, if running railway cars on Sunday on city passenger railways is a work of necessity within the meaning of the exception in the Act of 1794.   It may be doubted whether keeping theatres and places of public amusement open on Sundays

[Sparhawk v. Union Passenger Railway Co.]

might not be justified by the same line of argument.　Many might be found, doubtless, who would affirm on oath that theatrical representations are conducive to mental and bodily health, and that such recreation as they afford is a necessity.　Such a construction of the statute would make it but an empty sound. It would be losing sight entirely of the objects sought to be secured, the observance of a day of rest for the community, thereby enabling every one to worship God according to the dictates of his conscience, without distraction, and without disturbance, and thus giving a check to vice and immorality.　A construction that leads to such an absurdity must be erroneous. There is no other possible interpretation, which gives to the act any operation, but that which holds the works of necessity spoken of to be such as are necessary to the actor.　When the thing to be determined is whether worldly business done by any man, and not described in the proviso, is exempt from the prohibition because a work of necessity, the question must always be—is it necessary to him who does it ?　The defendants do not claim that running their cars for hire on Sunday is a charity, nor even that it is necessary for them.　All they assert is that it is a convenience or a necessity for others.　I think the act does not allow them to shelter themselves under others.

" Moreover, the question is not an open one.　It has been settled by the solemn decision of this court.　Johnson v. The Commonwealth, 9 Harris 102, determined that running an omnibus in a city, daily and every day, is worldly employment, and not a work of necessity or charity, within the meaning of the Act of 1794, and therefore unlawful on Sunday.　This case is directly in point, and, though decided by a divided court, it is the law of the Commonwealth, from which I am not at liberty to depart, even if I doubted the correctness of the decision, which I do not.　The opinion was delivered by the present Chief Justice of this court, and in it he fully met and answered the argument, now reproduced, that running a public conveyance on Sunday is a work of necessity.　Judges Lowrie and Knox concurred with him.　No one of these judges has ever departed from the ground taken in that case.　And in Commonwealth v. Jeandelle, 2 Grant 506, my brother Thompson, another judge of this court, announced, in substance, the same doctrine.　He declared that driving a public conveyance for hire, is doing worldly employment within the provisions of the Act of 1794 beyond doubt.　His whole opinion is an assertion that running cars on city passenger railways on Sundays, is contrary to law.　It is then beyond controversy that the conduct of these defendants, which the complainants seek to restrain, is a palpable violation of the laws of the Commonwealth. And I cannot doubt that it has been so considered by the defendants themselves.　Their conduct in seeking protection under a

contract to carry the mails, before they began to run cars on Sunday, shows that such was their opinion. I have then before me, a corporation, a creature of law, to which the Commonwealth has granted very large privileges, at the expense of the public, palpably and persistently defying the laws of the state which gave it being. To use the language of the Act of June 16th 1836, its acts are contrary to law and prejudicial to the interests of the community.

" I come next to the question whether these complainants have shown themselves entitled to ask for the intervention of this court to restrain this illegal action of the defendants. It must be admitted that it is essential to such a right that they should show that they are sustaining a particular injury. And I think it is incumbent upon them to show that the illegal acts of the defendants interfere injuriously with their rights of property. I agree that equity will not enforce a penalty or enjoin against the commission of a crime, when it is merely a crime and not also an injury to private rights of property. But an act may be a public offence and also a private wrong. Of this there are many examples. A public nuisance is one. And when private individuals suffer an injury quite distinct from that of the public in general, in consequence of a public nuisance, they are entitled to an injunction and relief in equity, which may thus compel the wrongdoer to take active measures against allowing the injury to continue: 8 Sim. 193; 9 Paige 575. I am not called upon now to define minutely every class of cases in which equity will interfere. The Act of 1836 gives to this court power to ' restrain the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals.' For the present I assume that the rights of individuals spoken of are rights of property. Such, I think, is the meaning of the act. What rights of property, then, if any, have the complainants with which the illegal conduct of the defendants interferes injuriously ? They own and occupy dwelling-houses along the line of the defendants' railway. They own pews in churches situate also on the line of the railway. As owners of dwelling-houses, they have a right to protection against all unlawful noise and disturbance of domestic quiet. Noise is an annoyance which may be complained of, and of which courts will take notice. The celebrated case of an injunction against ringing bells, 2 Sim. N. R. 139, is an example. My brother Thompson granted an injunction against a tinsmith at the suit of a householder disturbed by the noise of his business. It is plain that the enjoyment of real property may be seriously damaged by noise alone. Constant firing of cannon or beating of drums before a dwelling-house would render it untenantable. Now what is the nature of the enjoyment which the law secures to every owner of a dwelling-house in the Commonwealth

[Sparhawk *v.* Union Passenger Railway Co.]

on Sunday ? I am not inquiring whence his rights come, whether from the common law or the Act of 1794. Their origin is immaterial. It is very plain that a man has a right to a different enjoyment of his house on Sunday from that which he can claim on any other day of the week. The very purpose of the Sabbath laws, as declared in the earlier statutes, and as shown in Commonwealth *v.* Johnson, and in Commonwealth *v.* Nesbit, 10 Casey 405, was that people may devote the day to rest and to the worship of God. Every unlawful thing that is distracting, that disturbs such rest, is an interference with this purpose. A man has a right to use his house on Sunday for his own devotions, and for the religious instruction of his family, undisturbed by anything that is illegal on that day. This is a legitimate use, a right of property belonging to him as a property owner. He can no more be deprived of it without authority of law, than he can of any other use to which he may devote his house. Nor does it matter that it is a right which others may not prize. In the estimation of many, it is an invaluable right, a deprivation of which would greatly diminish the worth of their property to them. Let those call it fanciful who will, it is still true that equity will protect a party in the enjoyment of his property in whatever manner he pleases, if he does not by such enjoyment invade the rights of others : Bonaparte *v.* The Camden and Amboy Railroad Co., 1 Baldwin 230. That case holds that even if the object of the owner be not profit, but repose, seclusion and a resting place for himself and family, a court of equity will protect him in *such* enjoyment. In Jackson *v.* The Duke of Newcastle, 10 Jur. N. R. 689, it was held that equity has jurisdiction to prevent an injury that renders a property unsuitable for the purpose to which it is applied, or which lessens considerably the enjoyment which the owner has of it. And in Bostock *v.* The North Staffordshire Railway Co., 2 Jur. N. S. 248, an injunction was granted to prevent a regatta on a lake, whereby crowds would have been drawn to the neighborhood of the complainant's property, disturbing its privacy. The language of the Vice-Chancellor is significant. Said he, ' If it be objectionable, if he conceive it to be injurious to him, in interfering with his comfort, or even as distasteful, he (the complainant) has a right to confine the enjoyment of the defendant's right, within the essential terms of the contract by which it was obtained.' I may not feel prepared to go quite this length, but these cases show that the law recognises as a right of property a right to repose in one's dwelling, and freedom from external disturbance.

" Especially are pewholders entitled to protection in the enjoyment of their pews, as pews are designed to be enjoyed. Pews in churches are real property, recognised as such by the law. They are the subject of sale, and they often bring prices equal to

the value of many small farms. An action may be maintained for disturbance of their enjoyment. But the whole value of a pew consists in the facilities it affords for joining in public worship, and for receiving the instruction given in churches. To render it unfit, in any way, for the purpose for which such property is designed or used, is its destruction, and it may amount as fully to an irreparable private wrong as is any unlawful act against which a chancellor enjoins.

" Such being the rights of property of the complainants, Sparhawk and others, the next question is whether the unlawful acts of the defendants interfere with these rights. On this subject the proofs leave no doubt. One of the complainants has sworn that the running of the cars past his house on Sunday so disturbs the quiet of his house as to compel him to keep the front windows closed, and, when reading aloud to his family, to abandon the front rooms. He considers that such an invasion of his enjoyment depreciates the value of his property. All the other complainants, who charge unlawful interference with the lawful enjoyment of their dwelling-houses, assert, on oath, substantially the same grievances. They are driven from the front rooms of their houses ; their meditations and their Sabbath rest are broken up ; and the lawful uses to which they desire to devote their property are made impossible.

" Equally palpable is the invasion of the rights of the other complainants, who are pewholders in churches. The evidence shows clearly that they are disturbed in the enjoyment of their pews, to which they are entitled, and without which the pews are valueless. Their attention is distracted ; they can hardly hear the preacher ; they lose some of his words. In one instance a whole prayer was lost. The solemnities of a communion service were interrupted, and worship generally is very seriously hindered. The noise of running the cars, the grating of wheels on curves, the clatter of horses' hoofs in starting, the sound of the signal bell, and the hallooing of those who wish to stop the cars for passage, seriously annoy the occupants of the pews, and lessen, if they do not destroy, that enjoyment of their property which the law accords to them. And the wrong of which they complain is a continuing one. The cars have run for weeks on Sundays, and it is proposed to continue such running hereafter. To decide that this is not a case where the defendants are acting contrary to law, and prejudicially to the rights of individuals, is more than I am able to do. Nor is this invasion of the complainants' rights in any manner contradicted. It is no traverse of the averment of a pewowner that he is disturbed in the lawful enjoyment of his pew to assert and to prove that others are not disturbed in the enjoyment of theirs. Their pews may not be similarly situated. They themselves may not wish to pay as close attention to the

[Sparhawk *v.* Union Passenger Railway Co.]

church services as the complainants do. Their attention is no measure of the attention which the complainants have a right undisturbedly to give. The question before me is whether the *complainants* are disturbed. While it is true that no man can be compelled to any form or degree of worship, it is equally true that no man can be disturbed in that worship which he may desire to render to his Sovereign God.

"Nor are any of the numerous affidavits submitted by the defendants in conflict with the proofs that those of the complainants who are owners of houses along the line of the defendants' railway are disturbed in the lawful enjoyment of their property. The affiants are not disturbed in *their* dwelling-houses. The uses to which they may wish to devote their property may not be the same. They may not wish to devote the Sabbath to meditation, and to the religious instruction of their families. But the complainants do, and therefore they are disturbed. I need not say that what may be no annoyance to one man may be an unlawful disturbance to another. In this land of religious freedom, a man may, if he pleases, regard the Sabbath as sacred, the Lord's day, as it is called in the Act of Assembly. Another may not. One may use his house as a place for meditation, quiet and repose, a place for family instruction and devotion. Another may devote his property to no such uses. They are, however, lawful uses. The first may not interfere with any lawful uses to which the others may apply their property. They may not interrupt his lawful use of his own. It is very obvious that to one desirous of devoting his house to religious uses on the Sabbath, what would be no annoyance on a week day would be a very serious one on Sunday. An outcry at the dead hour of night, or near a sick chamber is a very different thing from a similar noise at any other time or place. So a business or a noise which would be unnoticed on a week day compels attention and positively disturbs on a Sunday. It was to this that my brother Thompson alluded when he spoke of the ' peace of the Sabbath' in Jeandelle's case, a right of the public involving a corresponding duty of individuals, larger on Sunday than on any other day. The public right has a corresponding private right in the citizen.

"Without, then, referring in detail to all the affidavits submitted, though I have read and considered them all, I entertain no doubt that the action of the defendants is not only contrary to law, but that it is a substantial and continuing invasion of the rights of property belonging to the complainants, which, unless arrested, must render such rights comparatively valueless. Why, then, should I not interpose an injunction? Because, first, say the defendants, their act is a crime, and equity never enjoins against a commission of a crime. The objection is plausible rather than substantial. It is true that equity does not gene-

[Sparhawk *v.* Union Passenger Railway Co.]

rally enjoin against a crime as a crime, but the books are full of cases in which an injunction has been decreed against acts injurious to individuals, though they may have also amounted to a crime against the public. I have referred to some of these cases. Others are so numerous that it would be an affectation of learning to cite them.

"Again, it is objected that the Act of 1794 prescribes the penalty to which the defendants are subject, and that under the Act of 1806 the complainants can resort to no other remedy. The objection makes the Act of 1794 substantially a license law. It was repudiated by Judge Thompson in Jeandelle's case, and it is a perversion of the Act of 1806. It confounds the public offence with the private injury. The Act of 1794 provides no remedy for private wrongs, and these bills do not seek to punish the public offences. Even if the running of the cars on Sunday, in the prosecution of ordinary worldly business, is not illegal at common law, which I am unwilling to admit, the Act of 1794 undertakes no more than to provide a penalty for the public offence. It leaves private sufferers to seek redress in the ordinary modes accorded by judicial tribunals. It would, I think, startle the community to be told, that when an Act of Assembly prohibits storing powder in quantities, under a penalty recoverable only by the Commonwealth, a man whose property has been blown up by powder illegally stored, has no redress against the wrongdoer. Such is not the law.

"It is further objected that an injunction ought not to issue until there has been a trial at law. I know that, in applications to a court of equity to restrain a nuisance, if there be serious doubt in regard to the title of the complainant to the property injured, or doubt whether any nuisance exists, or whether the complainant is specially injured by it, a chancellor will refuse to act until the doubts have been settled by a trial at law. Such a trial is for his information. But what doubt is there in this case? None in regard to the facts. The title of the complainants to their pews and dwelling-houses is not denied. The extent of their rights as property-owners is a matter of law. It cannot be submitted to a jury. The running of cars on Sunday by defendants is admitted. That this is illegal is a determination of law, and that there is a special injury to the complainants, consequent upon this breach of law, is proved, and not contradicted. What, then, is left to be submitted to a jury? What their finding must be is a foregone conclusion. How, then, could my conscience be informed or guided by any trial at law? The objection is therefore inapplicable to any such cases as these now before me.

"The result of all this is that the complainants, Sparhawk and others, have, in my opinion, a clear right to my interposition to protect them in that enjoyment of their dwelling-houses and their

[Sparhawk *v*. Union Passenger Railway Co.]

pews, to which I have shown they are entitled by law. It may be that there is a formal error in the joinder of plaintiffs having distinct interests. If there is, it is remediable by amendment. And the very eminent counsel of the defendants, who have argued these cases with signal ability, as well as with fairness, have properly declined to avail themselves of the error, seeking only a decision upon the merits of the controversy. In the case of Sparhawk against the Union Passenger Railway Company, I shall therefore grant the injunction for which I am moved.

" The case of Kenton against the same company and others is, if possible, still more clear. He is a stockholder, and, as such, he has a right to insist that the company shall do nothing *ultra vires*, or contrary to law. Such conduct imperils his interests. He may have purchased his stock with a full knowledge that the company was acting illegally, but his right is nevertheless to demand that there shall be no continuance in illegality. There is no analogy between the position of this complainant and that of the complainant in Scott *v*. The Atlantic and Great Western Railroad Company, to which my attention has been called. Scott was seeking to destroy the company of which he claimed to be a shareholder. This plaintiff seeks only to compel his trustees to obey the law, and act within the compass of their powers. He has a clear interest to be protected. The control of a corporation by courts of equity at the instance of a stockholder is a well-recognised branch of equity jurisdiction.

" That the acts of which this plaintiff complains are unauthorized and unlawful is not to be disputed. I have already shown that running cars on Sunday is contrary to law. It exposes the defendants at least to the imposition of a penalty. It would be a scandal were I to weigh their possible profit, gained by defiance of law, against the penalties to which they are subjecting themselves. It is also plain that they have no legal authority to carry the mails or to enter into a contract with the United States Government to carry them. If anything is settled it is this, that a corporation has no power beyond what is given by its charter. What is not clearly given is denied. These defendants were incorporated as a passenger railway company, to transport passengers, and nothing else. By the law that gave them being, they were positively prohibited from permitting freight of any kind to pass over their railway. And, in addition to this, they were expressly subjected to the city ordinances, one of which interdicts the transportation over passenger railways of any other thing than passengers. It was therefore beyond their power to contract with the Federal Government to collect and carry the mails, and every step taken in pursuance of such an attempted contract is without right. As well might they have contracted to transport all the cannon and military stores which the Federal

Government may have to pass through the city. It appears probable that the defendants sought this contract as a means to enable them to override the state law, but instead of relieving them from the obligation to cease from their ordinary worldly employment on the Lord's day, it makes their conduct a double violation of law. In this case, therefore, as well as in the other, an injunction will be awarded."

Afterwards the defendants put in answers. As to the first bill they admitted running their cars with horse-power, and carrying passengers for hire on Sunday, but denied that such running is in violation of the laws of this Commonwealth; they averred that in their cars on Sunday they have always carried to and from churches and places of worship large numbers of persons, including ministers, a large proportion of whom would otherwise, owing to distance, age, sickness or infirmity, coupled with poverty or narrow circumstances, have been wholly unable to go there; and also scholars and teachers to Sunday-school, many of whom, for like reasons, would have been deprived of the privilege of being at such school. They have, by giving these facilities, assisted to revive failing churches, and given strength to diminished congregations. They have thus enabled physicians to visit the sick, and those who need medical service to seek it at the offices of physicians, many of whom, since passenger cars have come into use, have used them constantly, have dispensed with carriages or wagons, and cannot afford to keep them for one day alone. They have enabled persons to engage in works of charity, benevolence and mercy, such as attending at hospitals, and visiting the poor and sick on Sunday, who would but for this means have been unable to do so. They have enabled parents to visit their children, children their parents, and members of the same family, whether sick or well, to have social intercourse, and fulfil the duties of relationship. They have enabled the sick and overworked poor to escape on this the only day in the year on which they can do so, from small and confined rooms, &c., to the parks, &c., by which health has been promoted and lives preserved, &c. These beneficial results have arisen from the running of the cars on Sunday, and have been increased to such an extent, and such means of locomotion have become so statedly and universally relied upon as to make them, in the city of Philadelphia, owing to its unparallelled extent and enormous population, an undoubted necessity on said day within the meaning of the Act of April 22d 1794. They denied that the plaintiffs were, by the running of said cars, deprived of their right of enjoying the Sabbath as a day of rest and religious exercise, or disturbed thereby, or prevented from engaging peaceably and without interruption in the worship of God, either in their places of worship or at their residences, or the peace and quiet of the day unlawfully broken;

[Sparhawk v. Union Passenger Railway Co.]

that any rights of property of said plaintiffs were thereby infringed, or any of their property rendered less valuable. They averred that the cars are run on said day without bells, and make much less noise than ordinary carriages, &c.

As to the second bill, they averred that the five shares of stock of the plaintiff were purchased after the defendants had made their contract with the Post-Office Department, and after they had begun to run their cars on Sunday, and with a full knowledge of said facts, not because of the supposed value of said shares, or as a bonâ fide investment of the price thereof, but solely at the suggestion of John Sparhawk and others, plaintiffs in the first bill, in aid of the bill of the said Sparhawk and others, and for the same object; and that no other stockholders of said company, as respondent believes, will unite with them in said bill. They averred that running their cars on Sunday was lawful, and in support of this averment state the facts set forth in the answer to the first bill.

They averred also that soon after the issuing of the injunction in this case, the mail contract was, with the consent of all parties thereto, cancelled and rescinded, and no such contract is now in force; that the plaintiff's stock is not now and never has been in any peril, and plaintiff is in no danger of losing the value of the same; that the filing of said bill was not for the purpose of protecting said stock, but for the purpose in the first paragraph of this answer set forth and averred.

Testimony was afterwards taken on behalf of the defendants before an examiner, from ministers, physicians and others, showing mainly that the running cars on the Sabbath was necessary in attending the sick and going to places of worship, affording recreation to poor people living in badly ventilated neighborhoods, &c.

It was agreed that all of the affidavits, &c., read by either party, or presented at the argument of the motions for preliminary injunctions, should be considered as proof taken in both cases before an examiner, and that decrees pro formâ be made in the cases in favor of the plaintiffs, in accordance with the prayer of each bill, and the cases certified into the Supreme Court in banc, the injunction granted to remain until the entry of the final decree.

The error assigned was granting the injunction.

E. S. Miller and G. W. Biddle (with whom was J. O'Byrne), for appellant.—Equity will not, by injunction, enforce a penalty or enjoin against a criminal or penal act: Mayor of Hudson v. Thorne, 7 Paige 264. Equity will not enjoin an act merely because it is illegal: Solteau v. De Held, 2 Sim. & St. 153; White v. Cohen, 1 Drew. 312; Commonwealth v. Wellsboro' & Tioga Railroad Co., 11 Casey 152.

4 P. F. Smith—27

[Sparhawk *v.* Union Passenger Railway Co.]

The Act of June 16th 1836, § 13, Purd. 401, pl. 3, Pamph. L. 789, authorizing courts of equity to enjoin acts contrary to law, and prejudicial to the rights of individuals, did not intend to enlarge equitable jurisdiction, or create a new·test of what is a nuisance or trespass, which will authorize an injunction: Commissioners *v.* Long, 1 Pars. 152; Commonwealth *v.* Rush, 2 Harris 193; Hagner *v.* Heyberger, 7 W. & S. 107; Denny *v.* Brownson, 5 Casey; Stockdale *v.* Ullery, 1 Wright 487.

There is no other head of equity under which the plaintiff can come but the head of *nuisance.* The plaintiff must make out a nuisance, and a private nuisance. If abstract illegality does not make or aid a nuisance, the Act of 1794 has no relevancy: Mohney *v.* Cook, 2 Casey 342; Commonwealth *v.* Naylor, 10 Id. 86. Our Act of 1806, § 13, Purd. 41, pl. 5, 4 Sm. L. 332, which requires that where an act is forbidden by any enactment, the remedy provided by such enactment must be pursued, strengthens this view: Commonwealth *v.* Jeandell, 2 Gr. Ca. 510.

A breach of the Sunday law is a public offence only, and in no sense a private one: Commonwealth *v.* Wolf, 3 S. & R. 49; Mohney *v.* Cook, 2 Casey 348; Scully *v.* Commonwealth, 11 Id. 513; Murray *v.* Commonwealth, 12 Harris 271.

It must be a nuisance to a single property; several owners of several houses cannot join in a bill for such relief: Hudson *v.* Madison, 12 Sim. 416.

Substantial injury, requiring immediate relief, must be clearly shown: Owen *v.* Herman, 1 W. & S. 550; 1 Com. Dig. 180; 1 Lev. 247; 1 Sid. 34; Id. 5 Co. 73 a; Mainwaring *v.* Giles, 5 B. & Ald. 356 (7 E. C. L. 129); 6 Barb. 317; Walter *v.* Self, 15 Jur. 416; White *v.* Cohen, 1 Drew. 318; St. Helen's Smelting Co. *v.* Tipping, 11 Jur. 787; Rhea *v.* Forsythe, 1 Wright 506.

Even if substantial injury to property requiring immediate relief be clearly shown, the court, in judging of this injury, and deciding whether it amounts to a nuisance, will always look at the advantages resulting from the act complained of: Baines *v.* Baker, 1 Amb. 158; Bamford *v.* Fernley, 9 Jur. 377; Hale *v.* Barlow, 4 C. B. N. S. 334; Boardman *v.* Treadwell, 3 Gif. 699.

Christianity is part of the common law in Pennsylvania as it was in England and no further, or in any other sense.

The common law of England as respects Sunday ·was that, while judicial proceedings on Sunday were void at common law, all other business transactions were valid until prohibited by statute: Merritt *v.* Earle, 31 Barb. 41, citing 3 Burr. 1597; Commonwealth *v.* Nesbit, 10 Casey 409; Johnson *v.* Commonwealth, 10 Harris 108; Rex *v.* Younger, 5 T. R. 449.

They cited also on the question of irreparable mischief, Earl of Ripon *v.* Hobart, 2 Myl. & K. 169.

As to the duty of requiring verdict in doubtful cases, where

[Sparhawk *v.* Union Passenger Railway Co.]

immediate action is not imperatively necessary : Cooper *v.* Matheys, C. C. U. S., 5 Pa. L. J. 38 ; Semple *v.* London B. Railway Co., 1 Eng. Railway Cas. 120 ; Commonweath *v.* Rush, 2 Harris 186.

As to the right to make a contract on Sunday for hiring of vehicle to visit parent : Logan *v.* Matthews, 6 Barr 417.

As to stockholders' bill : Ffooks *v.* S. W. Railway Co., 1 Smale & Gifford (decided in 1852) pp. 162–167 ; Forrest *v.* Manchester Railway Co., 30 Beavan 40, decided in 1861 ; Rogers *v.* Oxford, W. & W. Railway Co., 2 De Gex & Jones 674, decided in 1858.

*W. J. McElroy* and *Porter* (with whom was *C. S. Patterson*), for appellees.—It is no answer to our testimony to prove that other persons have not been disturbed in their residences or churches : Soltau *v.* De Held, 2 Sim. New R. 133.

The appellant being a corporation, the action complained of *ultra vires* and the result of that action an invasion of the rights of the appellees, this court will enjoin without inquiry into the extent of the injury : Commonwealth *v.* The Pittsburg and Connellsville Railroad Co., 12 Harris 159 ; Commonwealth *v.* Rush, 2 Id. 193 ; River Dun Nav. Co. *v.* North Midland Railway Co., 1 Eng. Railway Cas. 135.

That the action complained of is *ultra vires,* can readily be shown : Act of April 22d 1794, § 1, Purd. 924, pl. 3, 3 Sm. L. 177 ; Johnston *v.* Commonwealth, 10 Harris 102 ; Commonwealth *v.* Jeandell, 2 Grant's R. 506 ; Commonwealth *v.* Erie and North East Railroad Co., 3 Casey 351 ; Omit *v.* Commonwealth, 9 Harris 434.

A pew is property : Hennessey *v.* The Bank, 6 W. & S. 300 ; Bates *v.* Sparrell, 10 Mass. 323.

An injunction will be granted where personal rights, whose immunity is guaranteed by law, are invaded : Hulseman *v.* Rems, 5 Wright 396 ; Ewing *v.* Thompson, 7 Id. 372 ; Kneedler *v.* Lane, 9 Id. 238 ; Kerr *v.* Trego, 11 Id. 292 ; Cronise *v.* Cronise, ante, p. 255.

The running of the cars on Sunday amounts to a public nuisance, and the appellees are, therefore, entitled to an injunction, upon showing a special injury : 2 Eden on Injunction 259 *et seq.* ; Story's Equity Jurisprudence, § 924, *et seq.* ; Attorney-General *v.* Forbes, 3 Mylne & Craig 123 ; Sampson *v.* Smith, 8 Sim. 275 ; Spencer *v.* The Railway Co., Id. 193 ; Corning *v.* Lowere, 6 Johns. Chan. 439 ; Biddle *v.* Ash, 2 Ash. 219 ; Hughes *v.* Heiser, 1 Binn. 463 ; Pittsburg *v.* Scott, 1 Barr 319 ; Attorney-General *v.* Nichol, 16 Ves. 343 ; Fishmongers' Company *v.* East India Company, 1 Dickens 163 ; Earl of Bathurst *v.* Burden, 2 Brown's Chan. Cases 64 ; Coulson *v.* White, 2 Atk. 21 ; Jackson *v.* The Duke of Newcastle, 10 Jur. N. S. 689 ; Broadbent *v.* The Impe-

rial Gas Company, 26 Law J. (Eng.) 276; Corning v. Lowere, 6 Johns. Chan. R. 439; Beatty v. Curtz, 2 Pet. R. 566; Soltau v. De Held, 2 Sim. R., N. S. 133; Bostock v. The North Staffordshire Railway Company, 2 Jur. N. S. 248; Bonaparte v. The Railroad Company, 1 Bald. 205; Respublica v. Caldwell, 1 Dall. 150; Howell v. McCoy, 3 Rawle 269; Pottstown Gas Company v. Murphy, 3 Wright 257; Attorney-General v. Birmingham, 4 Kay & Johnson 528; McCallum v. Germantown Water Company, ante, p. 40; Holman v. The Boiling Spring Bleaching Company, 1 McCarter's Ch. R.; Bullen v. Michel, 2 Price 399; O'Connor v. Cook, 8 Ves. 536; Field v. Holland, 6 Cranch 22; Dennis v. Eckhardt, 3 Grant 390; Scheetz's Appeal, 11 Casey 88.

As to the penalty imposed by the Act of 1794 for the commission of acts forbidden by it: it is argued upon the other side, that in the exaction of that penalty is our only remedy; that cannot be; for it would convert the penalty into a license: Cory v. The Railway Company, 3 Eng. Railw. Cases 537; Kelly v. The Commonwealth, 11 S. & R. 345; Smith v. Shuler, 12 Id. 242; Aycinena v. Peries, 6 W. & S. 257.

As to the stockholders' bill.—The appellee asks the aid of equity to restrict corporate action within legal corporate limits, and does not seek to restrain it in one lawful act, nor to deprive it of one legitimate source of profit. This court will not look at his motives, but only at his title: Natusch v. Irving, Gow on Partnership, App. 398; Colman v. The Eastern Counties Railway Company, 4 Eng. Railw. Cases 514; Attorney-General v. The Great Northern Railway Company, 2 Law Times R. 656; Cohen v. Wilkinson, 5 Eng. Railw. Cases 748; Bagshawe v. The Railway Company, 6 Id. 152; Simpson v. Westminster Palace Company, 8 Clarke's Ap. Cases 712; Hattersley v. The Earl of Shelburne, 31 Law J. Ch. 873; Sandford v. The Railroad Company, 12 Harris 378; Mott v. The Penna. Railroad Company, 6 Casey 19; Gratz v. The Railroad Company, 5 Wright 447.

They also cited People v. Ruggles, 8 Johns. 290; Brill v. Flagler, 23 Wend. 354; Elliotson v. Feetham, 2 Bligh, N. C. 134; Carrington v. Taylor, 11 East 571; Rex v. Smith, 1 Strange 704; Church v. Railroad, 5 Barb. 79; 4 Bla. Com. 63; Coke's 2d Inst. 220, 264; Fortescue De Laudibus, &c., 120; Selden's note (e); Finch. Hist. of the Law; 3d Chit. Gen. Prac. 1604; Saxon Laws, fol. 2, 55, 78.

The opinion of the court in Sparhawk v. The Union Passenger Railway was delivered at Pittsburg, November 7th 1867, by

THOMPSON, J.—The law intends and generally does provide remedies for the redress of every wrong and the vindication of every right. These necessarily differ with the variety into which rights and wrongs are classed in communities of diverse pursuits

and dense population. For example, in the civil department of the law, ejectment is the appropriate legal remedy for the wrongful deprivation of the possession of real estate; replevin for the recovery of chattels; assumpsit for the breach of simple contracts; debt for money due by a specialty, covenant for the breach of contracts under seal; proceeding in equity for the specific performance of contracts, and "to restrain acts contrary to law and prejudicial to the interests of community or the rights of individuals."

He who is under the necessity of applying to courts to vindicate his rights or redress his wrongs, must employ the appropriate remedy. If he might do otherwise, the law would cease to be a rule of action, and thus cease to be law. He must have a right to the redress sought either personally, or in a legally constituted representative capacity. He may not vindicate other people's rights by process in his own name, nor employ civil process to punish wrongs to the public. This is to be done only by public officers in the name of the public. Even when equity intervenes to restrain acts prejudicial "to the interests of the community," as it may under the Act of 1836, it must be by bill filed by the proper public officer, the Attorney-General of the Commonwealth, and not by a private party. This is fully shown in The Buck Mountain Coal Co. v. The Lehigh Coal and Navigation Co., 14 Wright 91, and many other cases. Private parties can invoke the chancery powers of courts only for the redress of private injuries done or threatened. These are statements of very general principles, but are important to be remembered in this case.

For the redress of a private injury, therefore, we must regard this bill, and not legitimately appropriate to any other. Keeping this in mind, it seems to me that the case in hand will be relieved of much irrelevant matter, prejudicial to a dispassionate decision on its true merits.

Injury to property, with reference to its reasonable and ordinary use, by continuous hurtful acts, constitutes a nuisance undoubtedly, and may properly be the subject of equity jurisdiction, not only to redress the injured party by restraining the injurious acts, but in some cases by compelling the wrongdoer to make amends for the injury done. In such a case the applicant for redress by injunction must establish a clear case of "irreparable injury" likely to ensue as the consequence of the continuance of such acts. He may not supplement a defective case by an alleged infraction of the penal laws in the acts complained of: Naylor v. The Commonwealth, 10 Casey 86, and Mohney v. Cook, 2 Id. 432. In the latter of these cases, it was said in the opinion of the court, Lowrie, C. J., "that a breach of duty to the state does not necessarily involve a breach of duty

to the defendant." I do not mean to deny, however, that when a private injury results from a breach of public law, the public wrong may not be redressed by the private remedy. This often occurs, but not because there is a public wrong, but because the private remedy has the effect of stopping the wrongdoer. Where the wrong is exclusively of a public nature, " the offender is answerable nowhere," as was said in Scully *v.* The Commonwealth, 11 Casey 513, " beyond the penalty of the law."

I fully concede that the opinion of my brother Strong at Nisi Prius, and the law and authorities referred to by him, establish very clearly, that the business of running passenger cars on the Lord's day, commonly called " Sunday," to use the language of the Act of 1794, is a violation of that act; and I agree that it is within its penalties; Johnson *v.* The Commonwealth, 10 Harris 103; and was what was held in The Commonwealth *v.* Jeandell, 2 Grant 510. Thus an important element towards the success of the complainant's application for an injunction may be regarded as established.

Looking at this as settled, the next and the most material inquiry is, has it been charged and proved that the acts complained of were prejudicial to the rights of the complainants ? It is vital that this be clearly established, or there is no authority to interfere by injunction, let the infraction of the penal laws be ever so flagrant, and when this is so in any given case, it is a consideration which ought not to influence the decision in the case in the least; if it does, just so far will there be a disregard of the rightful exercise of civil jurisdiction, and a correspondent infringement of criminal jurisdiction, vested by the laws and constitution elsewhere. The remedy by injunction is preventive, and is designed to put a stop to acts which otherwise would work irreparable mischief if not restrained. As its operation is to tie the hands of one party indissolubly, the right to such a remedy is always required to be clear, and the wrong likely to ensue distinctly established. As already said, when this remedy is sought by a private party it is only for the redress of a private injury, excepting when incidentally it may go further and redress one against the public.

The bill before us charges the defendant with doing acts which constitute a private nuisance to the complainants, or the charge is nothing which is cognisable in equity. In form the charge is scarcely free from liability to be demurred to, but this has not been done, and the case is before us on all the merits it contains. The charge must be of injury to property, or rather its enjoyment, or other personal rights, or it is not a case for equity. What is its nature will best appear by a citation of the charging part of it. It is as follows: " That by reason of the said unlawful business (running cars on Sunday) carried on as aforesaid by the

[Sparhawk v. Union Passenger Railway Co.]

defendants, they (the complainants) have been and are, and will be deprived of their right of enjoying the Sabbath as a day of rest and religious exercise, free of all disturbance from merely unnecessary and unauthorized worldly employment; that they have been, are, and will be thereby deprived from enjoying peaceably, and without interruption the worship of Almighty God in their accustomed places of public worship, or in their own residences on the Sabbath day; and that the lawful peace of the said day is thereby disturbed and broken; and the right of property which they possessed in their said churches or places of public worship, and in their private residences are and will continue to be thereby infringed upon, and their said churches and residences deteriorated and lessened in value."

It seems to me that this is clearly but a charge of the violation of the provisions of the Act of Assembly of 1794, which interdicts worldly employment on the Sabbath day, and that it describes nothing but the consequences which were intended to be prevented by that act. If this be so, then it is not a case of special injury, but only that which results from a public offence or wrong to all, and every one in the community alike where the act is committed. It is not possible, I think, to discover the connection between the cause of complaint and a private injury, excepting in and through the act as prohibited by the statute. And if we are to regard it as a common-law offence, the charge in the bill does no more than describe the fruits of the offence. Rest and quiet, on the Sabbath day, with the right and privilege of public and private worship, undisturbed by any mere worldly employment, are exactly what the statute was passed to protect: 10 Casey 398. The deprivation of these privileges is the sum of the complaint, and this bill is essentially, therefore, a bill to enforce by injunction a penal statute. That is not our province, especially at the suit of a private party.

If it be supposed that because an act is illegal merely, equity will interfere to restrain it, it is a misapprehension of equity jurisdiction. "If an act be illegal," said Vice-Chancellor Kindersley, in Solteau v. De Held, 2 Sim. & Stew. 153, "I am not to grant an injunction to restrain an illegal act merely because it is illegal. I could not grant an injunction to restrain a man from smuggling, which is an illegal act." Nor could he for any merely criminal or penal offence.

Injunction is a civil remedy to arrest or prevent civil abuses, when granted at the instance of a private party. Because worldly employment on Sunday is interdicted by statute and an offence, it is not a reason, any more than in the case put by the vice-chancellor, why we should interfere in equity to prevent it. The penal law that is violated is provided with the machinery for punishing it, and to it the violation must be referred. One reason why

[Sparhawk *v.* Union Passenger Railway Co.]

equity cannot interfere is that there is a remedy at law by statute, and we must presume it adequate, for it is what the law has provided and no more. If it could be restrained because a public nuisance, it would only be at the instance of some one authorized by the Commonwealth, and not by a private party. We need not say it could by any authority.

The proofs exhibited by the plaintiffs are like the bill, and show only the public offence, we think. It is in substance that on the Sabbath day, devotional exercises, such as reading the Scriptures, engaging in public or private worship, and giving religious instruction to children, are disturbed, especially in front parts of their dwellings, and that the enjoyment of their pews in the churches along the line of the defendants' road is interfered with, because of an inability, on account of the noise incident to the cars at the moment of passing, of distinctly hearing what the minister is saying or reading; and also because it is difficult, as proved by one witness at least, a respectable clergyman, to make himself heard by the congregation, and for these reasons it is, the property of the complainants is claimed to be injured and rendered less valuable.

If this be taken as the uncontradicted testimony, which is far from being the case, does it do more than establish the offence of a violation of the statute—and therefore is injurious because done on the Sabbath? That this is only so, is evident from the evidence and the facts, and that of the same acts performed on other days there is no complaint of resulting injury to the plaintiffs' property or that of anybody's else. Separated from the offence against the day, there is no complaint of injury—associated with it there is injury according to the plaintiffs. Is it not certain, therefore, that it is because of a violation of the Sunday law, that it is an injury? For this there is a remedy in the penal laws, and not by proceedings in equity, if we regard the facts as we ought to do.

It is not impossible to construct a plausible argument on the theory that any violation of a penal law is, without more, a special injury; but such an injury would be too shadowy to be the foundation for equitable interference; and besides the penal law is the remedy in such a case to redress it, and equity does not interfere.

But if there be any room for doubt of this view of the case, there are other aspects in which it seems impossible to sustain the decree, and one is, supposing the plaintiffs have set forth and proved an injury from the acts of the defendants, the proof, following the bill, makes a case of injury not tangible or material, but merely speculative and mental, or spiritual only, which will be shown to be *damnum sine injuria*, and not cognisable in courts.

Before proceeding to this, however, we ought to refer to the position of the proof, not only in its application to the clause of

the bill now to be specially noticed, but to the whole bill, to show how utterly impossible it would be for this court to determine whether it establishes what the complainants claim for it, or the opposite. In the concluding portion of the charging part of the bill, it is charged that if the cars continue to be run, producing the effect set forth in the preceding clause of it, "the rights of property which they (plaintiffs) possess in their said churches or places of worship, and in their private residences, are and will continue to be thereby infringed upon, and their said churches and residences thereby deteriorated and lessened in value." It will thus be seen that the injury which the plaintiffs complain of to their property, occasioned by the defendants running passenger cars on Sunday, is not that it in any degree affects its material structure; or that it is rendered unsafe to be occupied or uncomfortable in its ordinary and usual purposes; or that their pews are less comfortable and convenient as seats, but that the complainants will be deprived, by the running of the cars, of the right of enjoying the Sabbath as a day of rest and worship, free from the disturbance of worldly employment, and by this means their property is injured. The deterioration of property is thus attributed to the causes specified.

If there be such an injury to property disclosed in such a charge, the answer positively denies it, and the fact of damage and deterioration also. On these questions of fact the parties are at issue. Much testimony was given *pro* and *con* on this and the general question, whether running passenger cars on Sunday would, by its attendant noise, be a general annoyance and evil, or by the facilities it would afford to aged, infirm and distant residents from churches to get to them on Sundays, and a means of health to the public in a crowded city, enabling them on Sunday to get out, be a general benefit? On this and all material questions in the case, the witnesses were in direct conflict. Divines, medical men, business men and property-holders, were in numbers examined, and with the exception of the medical men, stood generally on opposite sides of the question; the latter, and among them some of the most eminent in the city, thought the running of cars would be a great sanitary measure and a public benefit. Property-owners on the same street, and pew-holders in the same churches, as well as in others, were directly antagonistic to each other. Persons opposite each other on the same streets, and equally exposed to the annoyance, if any, testified to entirely opposite experience in regard to whether the cars were on Sunday an injury to property or a benefit—an annoyance, or no more so than on other days.

Thus stood the question below, and now stands. In a case so circumstanced, an English chancellor would not attempt to decree until the right was established by a trial at law, either by an

[Sparhawk *v.* Union Passenger Railway Co.]

issue to be sent to a jury, or in an action at law. He would most probably send an issue containing the disputed facts to be tried by a jury. We have not always pursued this practice; but it is obvious that there are cases in which we must resort to it, and if ever there was a case in which it would not only be proper, but necessary, it is this case. How can we determine, in a case where it depends on the testimony of witnesses, and where they are nearly equal in numbers and directly opposite in statements, who is right and who wrong? We know nothing but from the counsel on the opposite sides about them. They speak through written statements, and generally prepared by counsel. We could not judge of the degree of weight the affiants are entitled to. In such a trial the most intelligent man, with the best opportunity for judging, and of the utmost candor, would appear in no better light than one the very opposite of this. Any decision on such testimony as to which party was right would obviously have no better basis than that of a *guess*.

It lies on a party who asks for a decree, the effect of which, if granted, is to bind his adversary hand and foot, to make out a clear case, of at least preponderating equity. He has no case if his equity is doubtful. In fact a doubtful equity would be an anomaly. It must be free from doubt, or there is no equity. He must make a case in which the chancellor may act with a good conscience. No such case is before us. We have a mass of contradictions about the very right of the plaintiffs' claim. About whether there is any injury resulting to the plaintiffs in the matter complained of. I refer to this merely to show how impossible it would be for us with any confidence, being ever so desirous of deciding, to say which party is right, even supposing the kind of injury be such as a chancellor would redress by injunction. We could not. We will not send the case to a jury, for, taking the injury as complained of, we do not think it a case for equity. We refer to this to show that the state of the testimony is such that no decree in its present state could with any certainty be made, even supposing a case for equitable interference be presented in the bill.

The ground alluded to, immediately preceding the last point, is now to be noticed, and which I think sufficient to have prevented an injunction from being granted in the first place; and that is the question whether the injury complained of is an injury to property at all; or if it can be held to affect property, whether it is that sort of injury from which damages can be held to spring. To make out a case of special injury to property from a nuisance —for that is what is complained of beyond doubt—something materially affecting its capacity for *ordinary use and enjoyment* must be shown before the act complained of will be enjoined; something demonstrable in some way, not a speculative, fanciful

injury to those occupying it. This complaint is special and attaches not to all, but only to certain persons, and there is no standard by which damages for an infraction of mere peculiarities may be measured or discovered. On this point Sir Knight Bruce, when Vice-Chancellor, in Walters v. De Selfe, 4 De G. & Sm. 222, which was a case of alleged nuisance, for which an injunction was sought, asks, " ought this inconvenience to be considered in fact as more than fanciful, more than one of mere delicacy or fastidiousness, as an inconvenience materially interfering with ordinary *comfort physically* of human existence, not merely according to elegant modes and habits of living, but plain, sober and simple notions among the English people ?" He affirmed the inquiry as a rule in the case. Lord Romilly, Master of the Rolls, in a late case (1867) of Crump v. Lambert, Law Rep. 3 Eq. 409, adopts it, saying, " I apprehend it is strictly correct, and it agrees with the principle of all the cases reported at common law, and is approved in St. Helen's Smelting Co. v. Tipping, 11 H. L. C. 642."

Religious meditation, and devotional exercises, are a duty and a privilege undoubtedly, but result nevertheless from sentiments not universal in their demonstrations by any means, but peculiar to individuals rather than to the whole community. Of this, like the matter referred to in the authority cited, injury to it by disturbance cannot be measured by any standard applicable to the privation of ordinary comfort. It cannot be affirmed, in regard to the devotional exercise embraced within the privilege, that it is more than a mental disturbance—an inconvenience. Human tribunals cannot tell anything about the effect of mere noise occasioned by ordinary employments on the mind. The belief is reasonable that its operations are independent of such physical facts ; that it is cognisant of its own impulses and emotions under all ordinary circumstances, when in its normal condition and free from disease. This is the rule of the criminal law, and it has never been held that a disturbance from ordinary causes excuses a criminal act. It seems to me that the rule expressed in the cases referred to is the only true one in judging of injury from alleged nuisances, viz., such as naturally and necessarily result to all alike who come within their influence. Not to one on account of peculiar sentiments, feelings or tastes, if it would have no effect on another, or all others without these peculiar sentiments or tastes. Not to a sectarian if it would not be to one belonging to no church. It must be something about the effects of which all agree ; otherwise, that which might be no nuisance to the majority, might be claimed to deteriorate property by particular persons. Noises which disturb sleep, bodily rest a physical necessity, noxious gases, sickening smells, corrupted waters and the like, usually affect the mass of the community in

one and the same way, and may be testified to by all possessed of their natural senses, and can be judged of by their probable effect on health and comfort, and in this way damages may be perceived and estimated. Not so of that which only affects thought or meditation. What would disturb one in his reflections might not affect another. There can be no general rule or experience as to this; it is incapable of being judged of like those things which affect health or comfort. We are not without authority on this point. Owens *v.* Henman, 1 W. & S. 548, was a common-law action, it is true, but this does not affect the principle. The action was for disturbing the plaintiff, a member of the "Old Presbyterian Church of Wysox," by loud noises, in singing, reading and talking, so that the plaintiff, as he alleged in his *narr.*, was prevented from hearing the preacher or joining in the religious exercises of the occasion. The court decided for the defendant on the demurrer, and on error it was affirmed. Sergeant, J., in delivering the opinion of the court, said, "In the first place, the injury alleged is not the ground of an action. He (the plaintiff) claims no right in the building, or any pew in it, *which has been invaded.* There is no damage to *his property, health, reputation or person.* He is disturbed in listening to a sermon by noises. Could an action be brought by every person whose mind or feelings were disturbed in listening to a discourse, or any other *mental exercise* (and it must be the same whether in church or elsewhere) by the noises, voluntary or involuntary, of others, the field of litigation would be extended beyond endurance. The injury, however, is not of a *temporal nature;* it is altogether of a *spiritual character for which no action lies.* It is settled that an action on the case does not lie where there is not any temporal damage, as against a woman who pretends herself single, and inveigles a man into a marriage, whereby he is disturbed in his conscience: 1 Com. Dig. 180; 1 Lev. 247. Nor does it lie for refusing to administer the sacrament: 1 Sid. 34. Nor for not reading divine service to plaintiff and the tenants of his manor: 5 Co. 73. In 5 B. & A. 356, it was decided that action will not lie for disturbing the plaintiff in the occupation of a seat in the body of a church, though he had contributed to the making of the seats." To the same point is The First Baptist Church *v.* The Utica and Schen. Railroad Co., 5 Barb. 313, in which is cited the last-mentioned case.

I take this rule to be well settled; and out of it arises another which seems equally well settled; and that is, that chancery will not enjoin the performance of acts for which damages may not be recovered at law. On this point, in Elmshirst *v.* Spencer, 2 Macn. & Gord. 45, Lord Cottenham said, "The plaintiff, before he can ask for the injunction, must prove that he has sustained such a substantial injury, by such acts of the defendant, as would have

entitled him to recover at law in an action for damages." This is cited as the rule by the vice-chancellor in Solteau *v.* De Held, *supra.* So in Crump *v.* Lambert, Law Rep. 3 Eq. 409, *supra.* The Master of the Rolls in that case said, " the law on that subject is, I apprehend, the same, whether it be enforced at law or by bill in equity. In any case where a plaintiff could obtain damages at law, he is entitled to an injunction to restrain the nuisance in the courts. * * * The real question in all such cases is the question of fact, viz., whether the annoyance is such as materially interferes with the *ordinary* comfort of human existence. This is what is established in St. Helen's Smelting Co. *v.* Tipping, and that is the question which is to be tried in this case." This rule is also recognised in Walter *v.* Selfe, *supra,* and in Sim. N. R. in Ch. 151. In the latter of these the doctrine is thus stated: " There is no such thing as an equitable nuisance: equity *will only interfere* in a case of nuisance when the act complained of is a nuisance at law." Many additional authorities might be added to the same effect, but the principle is obvious enough without more.

If, then, the doctrine of the cases of Owen *v.* Henman, and The Baptist Church *v.* The Utica and Schenectady Railroad Co., *supra,* be sound law, and I find nothing which in the least conflicts with them, it seems to me to follow as a necessary result that the plaintiffs in this case are not, on their bill and proof, entitled to an injunction; for on the authority of these and many other cases, as the facts stand, they would not be entitled to an action at law for damages. It must be difficult for any one to conceive of agencies, beneficial and innoxious, administering to the health, comfort and prosperity of all who come within their influence during six days of the week, becoming on the seventh pernicious to peace and destructive to property. It is not possible to be so in the sense in which the law regards the subject, namely, in its effect and operation on the ordinary and usual comforts and customary modes of living, and physical comforts of life. Noises that distress and annoy physically, deprive of sleep, shatter the nerves, and thus affect, or which may in time affect the health, are and ought to be regarded as nuisances. The ownership of property will not justify a use of it in such a way. The owner must either govern himself by the rule of the maxim *sic utere tuo ut alienum non lœdas,* or the law, acting through courts of equity, may compel him to do it. On this principle, a tinsmith in Philadelphia was restrained from working at unusual hours in the morning and evening, the proof upon which the decree was founded being an injury to property, by the injury to the health of its occupiers, on account of these noises. So in Solteau *v.* De Held, where the ringing of the bells was restrained. The ringing was almost incessant. The proof showed the num-

ber of times a day the bells were rung, and their exact size, in order to show their capacity to interfere with the comfort and health of the owners of the property complaining—the ordinary physical comforts. On this ground they were enjoined, and probably greatly to the spiritual discomfort of those who rang them. But the latter had to give way to the former.

But ours is a different case. The bill charges an injury, not physical, but mental or spiritual. One which neither deprives the body of rest, refreshment or health. That this is the nature of the complaint is most evident, from the fact that the disturbing causes are the same, and no greater, on Sundays than on other days, and of this there is no complaint. How are we to determine whether the mind is injuriously disturbed or not? To some it is granted that there may be annoyance in the passing of cars on Sundays. To others it would be but an agreeable sound. To many it would be an annoyance, because of their views of the Sabbath. But, as already said, that is not in this case for want of power in this form, to take cognisance of it. It is not possible in my judgment to establish a material injury, where alone at most the mind is disturbed without the slightest bodily effect or interference with ordinary comfort. It is but an inconvenience incident to the situation, and not the subject of an adjudication in equity.

When we speak of the rest and quiet of the Sabbath as citizens of a city, we speak of it relatively. Nobody can expect the same quiet in a city as in the country. If we build houses and churches in it, we must make allowance for the habits, customs and interests of the city. If there be noises incident to a large population, we have undertaken to put up with them. We cannot prosecute them as nuisances.

If we don't like them, we cannot stop the city to accommodate us. Progress will not be stopped to accommodate anybody's convenience. It must yield in consideration of our interests in the thousand advantages in other respects of city life. We should not attribute the fault in our own position to faults in others. There is undoubtedly more noise affecting churches and residences in a city than in a country; but this is to be expected. And courts must regard this if parties do not. If the substance of the complaint be an inconvenience, it is a matter with which, ordinarily, courts cannot interfere. In their civil jurisdiction they have nothing to do with it; and it seems to us that this is one of that kind. We have referred to the fact that there are no complaints of interruption or disturbance of religious exercises in public or private, in churches or in private residences, on secular days, along the line of this railway. We have a right to regard this as evidence that they are not disturbed by the mere running cars, and would not be, if cars were run on Sundays as on other

days. We ought to presume that both public and private worship is performed on week days as well as on Sundays along that line; the character of the complainants, and I presume their witnesses, justifies this.

Nothing, therefore, more clearly shows, I think, that it is not the private, but the public aspect of the case, which gives it its interest. With the public aspect, as already said, we have no right to interfere. The penal laws correct that. If they be not adequate, it is not our fault; nor would that justify our going beyond our legitimate sphere of action. On the argument, the great question seemed to be the rights of the Sabbath; although we were not invested with power in the proceedings before us to regard that in any but a secondary light. We could do nothing in the case unless we could discover a private injury of such a nature as to authorize us to act; and in redressing that, enable us to vindicate the Sabbath. If to the lay mind this seems refinement, to the legal it is the very alphabet of his learning. We have not been able to discover such injury in the proofs before us, and hence the incidental power to protect the Sabbath against the defendants' acts does not exist.

We know from actual observation, that cars run on the streets of the city of Pittsburg, on Sundays, without obstruction or complaint, so far as we can learn; and as a matter of history, that they are used on that day in the cities of Boston, New York, Albany, Troy, Brooklyn, Hoboken, Jersey City, in Baltimore, Nashville, Cincinnati, Washington and St. Louis. It is not easy, therefore, to be reconciled to the belief that their running in the city of Philadelphia is a nuisance and injury to private property, and not so in these cities. We can more readily believe that they are not a nuisance at all, than that these communities are less devotional or less careful of their interests than ours. If we are to hold them all equal in intelligence and morality, we must regard it as public testimony that running passenger cars is not a nuisance or becomes such by the practice of running them on that day.

Independently of these considerations, which apply to pew-holders as well as private property-holders, I am not able to see where the right is in an individual pew-holder in a church to proceed in his own name to enjoin a nuisance against a church to which he belongs. That the right does not exist was expressly held in the Baptist Church *v.* The Utica and Schen. Railroad Co., *supra.* It was declared in that case, " That the congregation and society worshipping there, and not the plaintiff (a pew-holder) are the persons molested. The custody and management of the real estate of a religious corporation belongs to the plaintiff as trustee." This is reasonable, and I take it to be the law. This would be an answer to the bill as to the pew-holders as it stands, but it is

[Sparhawk *v.* Union Passenger Railway Co.]

not necessary to adjudicate this point finally now in the view we have taken of the case.

This decision is not intended to infringe on what this court has more than once held, namely, the force of the Act of 1794, and that all worldly business not excepted in it, is liable to its penalties. We mean to hold nothing else now. For a century and three-quarters, the colony and State of Pennsylvania have been content to preserve the Sabbath day from the disturbance of worldly enjoyments, and as a day of rest—a day that might be enjoyed in devotional exercises and worship, public or private, by statutory penalties only. We hold no new doctrines, therefore, in this decision, but adhere to the old uninterrupted practice in regard to it, by leaving the complainants to the provisions of the statute to attain the end in view, if it be as I suppose it is, to preserve the day from merely worldly employment, and is infringed upon by the defendants. Were we to extend equity jurisdiction to such cases as this for the reasons and on the grounds shown, we should soon probably be engaged in hearing cases against all the great leading railroads in the state coming into Philadelphia, besides every other case of threatened or alleged infraction of the Sunday law, and soon possess ourselves of a jurisdiction beneath the weight of which no court could stand. If the penalties in the law be not deemed sufficient in any given case to preserve order and the "peace of the Sabbath," the legislature must amend the laws; we cannot supply their defects. For all these reasons and others which might be given, we think the injunction granted below should be set aside and bill dismissed.

And now, November 7th 1867, decree reversed and bill dismissed at the costs of the appellees.

Concurring opinion of

READ, J.—Christianity is a part of the laws of England, says Blackstone, and Lord Chief Baron Kelly, in the late case of Cowen *v.* Milbourn, Law Rep. 2 Ex. 234, uses similar language: "There is abundant authority for saying that Christianity is part and parcel of the law of the land."

Judge Duncan, delivering the opinion of this court, in Updegraph *v.* The Commonwealth, 11 S. & R. 400, forty-three years ago, said: "We will first dispose of what is considered the grand objection, *the constitutionality of Christianity*, for in effect that is *the question*.

"Christianity, general Christianity, is and always has been a part of the common law of Pennsylvania; Christianity without the spiritual artillery of European countries; for this Christianity was one of the considerations of the Royal Charter, and the very basis of its great founder, William Penn; not Christianity founded

[Sparhawk *v.* Union Passenger Railway Co.]

on any particular religious tenets; not Christianity with an established church and tithes, and spiritual court; but Christianity with liberty of conscience to all men." "And to the wilds of America, peopled by a stock cut off by persecution from a Christian society, does Christianity owe true freedom of religious opinion and religious worship." "From the time of Bracton, Christianity has been received as part of the common law of England."

It is clear, therefore, that, as our common law is derived from England, we must look to that country for information as to what our common law on this subject was and is. England, at least for the last eight hundred years, has always had an established church, with the single exception of the time of the Commonwealth. From William the Conqueror to Henry the Eighth it was the Roman Catholic, and from his death to the present time, with the exception of the reign of Queen Mary, it has been the Church of England. Of course this part of the common law has been affected and controlled, and formed by the practices and usages of the church established by law, and not by those of any other sect or denomination of Christians. England has an established church, and Scotland has also another, and neither have any control over the other. Our common law, however, is derived from England, and therefore it is only to England we are to look for it, and not to any other country.

The first day of the week, the Lord's day, commonly called Sunday, is a day for worship and rest as regulated by the civil authority. It is *dies non juridicus* in England, but in other respects it is the subject of positive regulation by the legislative authority. I am aware that some religious persons of some religious sects think the sanctity of Sunday, as a day of entire rest, is prescribed to all nations, and particularly to all Christians, by the fourth commandment in the Decalogue, but an attentive perusal of the 20th, 31st and 35th chapters of Exodus, and of the 5th chapter of Deuteronomy, will show that this commandment was specially limited to the Jewish nation alone. The words spoken were, "I am the Lord thy God, which have brought thee out of the land of Egypt, out of the house of bondage," and the verses succeeding the Decalogue, and the 21st chapter which commences, "Now these are the judgments which thou shalt set before them," show clearly that the commandments and judgments were addressed to the Israelites alone, and so, in the 24th chapter, where the people take the covenant and said, "all that the Lord hath said, will we do, and be obedient." So in the 12th to the 17th verses of the 31st chapter, "Speak thou also unto the children of Israel, saying, Verily my Sabbaths ye shall keep, for it is a sign between me and you throughout your generations." "Every one that defileth it shall surely be put to death; for whosoever

4 P. F. SMITH—28

doeth any work therein, that soul shall be cut off from among his people."

"Wherefore, the children of Israel shall keep the Sabbath, to observe the Sabbath throughout their generations for a perpetual covenant." "It is a sign between me and the children of Israel for ever."

So in the 35th chapter: "And Moses gathered all the congregation of the children of Israel together, and said unto them, 'These are the words which the Lord hath commanded, that ye shall do them. Six days shall work be done; but on the seventh day there shall be to you an holy day, a Sabbath of rest to the Lord; whosoever doeth work therein shall be put to death; ye shall kindle no fire throughout your habitations upon the Sabbath day.'" So we find in the 15th chapter of Numbers: "A man that gathered sticks upon the Sabbath day" was stoned to death by the congregation.

In the 5th chapter of Deuteronomy, "Moses called all Israel, and said unto them, Hear, O Israel, the statutes and judgments which I speak in your ears this day, that ye may learn them, and keep, and do them. The Lord our God made a covenant with us in Horeb. The Lord made not this covenant with our fathers, but with us, even us, who are all of us here alive this day." Then follows the Decalogue, but the reason assigned for the fourth commandment is in the 15th verse in these words, "And remember that thou wast a servant in the land of Egypt, and that the Lord thy God brought thee out thence through a mighty hand, and by a stretched-out arm: therefore the Lord thy God commanded thee to keep the Sabbath day."

In the 22d verse Moses says, "These words (the ten commandments) the Lord spake unto all your assembly in the mount, out of the midst of the fire, of the cloud and of the thick darkness with a great voice; and he added no more."

This recapitulation of Scripture makes it clear that the fourth commandment, which is a positive statute imposed upon the Israelites alone, as a people separated from all other nations by the Almighty for special and wise purposes, was not intended either for the Gentiles, or for those living under a later dispensation. Like circumcision, it was a sign between Him and them only. It was a part of the ceremonial law, like sacrifices, and not binding at any time on any nation except the Jews. It is evident that no great nation of modern times, living under the Christian dispensation, could submit to an observance of a day of entire rest under the penalty of death for any breach of it; for the command of the Almighty inflicted this penalty on the offender. The whole Jewish constitution was framed for a small and partially barbarous nation, whose tendency was to idolatry, and upon whom were imposed burdens which could only be borne by those

[Sparhawk *v.* Union Passenger Railway Co.]

who considered themselves as specially selected by the Godhead. It was not a nation who could spread their doctrines, or convert other nations, and their mission ceased with the birth of our Saviour.

The Old Testament contains moral revealed law, ceremonial and judicial laws—the two last being either typical, or intended especially or only for the Jewish people, under the old dispensation, were terminated by fulfilment or abrogation on the coming of Christ, and the completion of the Christian dispensation. This was the view of the Apostle Paul, when he says in his Epistle to the Colossians, " Blotting out the handwriting of ordinances that was against us, which was contrary to us, and took it out of the way, nailing it to his cross ; and having spoiled principalities and powers, he made a show of them openly, triumphing over them in it. Let no man therefore judge you in meat, or in drink, or in respect of an holy day, or of the new moon, or of the Sabbath days ; which are a shadow of things to come : but the body is of Christ." Col. ii., 14, 15.

So in his Epistle to the Galatians : " But now, after that ye have known God, or rather are known of God, how turn ye again to the weak and beggarly elements, whereunto ye desire again to be in bondage ? Ye observe days, and months, and times, and years. I am afraid of you, lest I have bestowed upon you labor in vain." Gal. iv., 9, 10. " Stand fast, therefore, in the liberty wherewith Christ hath made us free, and be not entangled again with the yoke of bondage." Gal. v., 1.

So in his Epistle to the Romans, 14th chap., 5th verse, " One man esteemeth one day above another ; another esteemeth every day alike. Let every man be fully persuaded in his own mind." " He that regardeth the day, regardeth it unto the Lord : and he that regardeth not the day, to the Lord he doth not regard it ;" and in the preceding chapter, 9th verse, the Apostle says, " For this, thou shalt not commit adultery ; thou shalt not kill ; thou shalt not steal ; thou shalt not bear false witness ; thou shalt not covet ; and if there be any other commandment, it is briefly comprehended in this saying, namely, Thou shalt love thy neighbor as thyself."

It is evident from these texts that the Apostle did not regard the fourth commandment as a part of the moral revealed law, but as a ceremonial or judicial law which was terminated by the coming of our Saviour and the completion of the Christian dispensation. It was part and parcel of the old dispensation fitted only for a small and peculiar nation, and necessarily perished with it, the whole being supplied by the Christian dispensation embracing in its outstretched arms, not a single people, but all the nations of the earth, and announcing principles of the purest morality exemplified in the life and teachings of the divine Author of our religion.

The fourth commandment was a positive statute, fixing the seventh day of the week as a day of rest, and is the day observed by the Jews; and of course the first day of the week cannot be the Sabbath day of the Decalogue.

The Sunday of the Christian world is therefore not the Jewish Sabbath of the fourth commandment, and such was the declared opinion of Luther, Calvin, and all the early reformers. Luther said: " As for the Sabbath or Sunday, there is no necessity for its observance; and if we do so the reason ought to be not because Moses commanded it, but because nature likewise teaches us to give from time to time a day of rest, in order that man and beast may recruit their strength, and that we may go and hear the word preached." " The Gospel regardeth neither Sabbath nor holidays, because they endured but for a time and were ordained for the sake of preaching, to the end God's word might be tended and taught."

" Keep the Sabbath holy for its use both to body and soul; but if anywhere the day is made holy for the mere day's sake— if anywhere one sets up its observance upon a *Jewish* foundation, then I order you to work on it, to ride on it, to dance on it, to feast on it, to do anything that shall remove this encroachment on the Christian spirit and liberty."

Calvin says in his exposition of the fourth commandment, " The Fathers frequently called it a *shadowy commandment*, because it contains the external observance of the day, which was abolished with the rest of the figures at the advent of Christ."

" But all that it (the Sabbath) contained of a ceremonial nature was without doubt abolished by the advent of the Lord Christ."

" Though the Sabbath is abrogated, yet still it is customary among us to assemble on stated days for hearing the word, for breaking the mystical bread, and for public prayers, and also to allow servants and laborers remission from their labor."

"They complain that Christians are tinctured with Judaism, because they retain any observance of days. But I reply, the Lord's day is not observed by us upon the principle of Judaism; because in this respect, the difference between us and the Jews is very great, for we celebrate it, not with scrupulous rigor as a ceremony which we conceive to be a figure of some spiritual mystery, but only use it as a remedy necessary to the preservation of order in the Church." .

" They" (Luther and Calvin), says Rev. Dr. Rice, " have observed the form rather as a matter of necessity or expediency, than as divinely commanded." Calvin encouraged the burghers of Geneva by his own presence and example at their public recreations, as bowling and shooting, upon the Lord's day after their devotions at church were ended.

[Sparhawk v. Union Passenger Railway Co.]

Barclay, in his Apology, says: "We not seeing any ground in Scripture for it, cannot be so superstitious as to believe, that either the Jewish Sabbath now continues, or that the first day of the week is the antitype thereof, or the true Christian Sabbath; which, with Calvin, we believe to have a more spiritual sense; and therefore, we know no moral obligation by the fourth command or elsewhere, to keep the first day of the week more than any other, or any holiness in it. But, 1st, forasmuch as it is necessary that there be some time set apart for the servants to meet together to wait upon God; and that 2dly, it is fit at sometimes they be freed from their *outward* affairs, and that 3dly, reason and equity doth allow, that servants and beasts have some time allowed them to be eased from their constant labor; and that 4thly, it appears that the Apostles and primitive Christians did use the first day of the week for these purposes, we find ourselves sufficiently moved for these causes to do so also, without superstitiously straining the Scripture for another reason; which is, that is not to be there found, many Protestants—yea, Calvin himself upon the fourth command hath abundantly evinced."

Melancthon, Beza, Bucer, Zuinglius, Cranmer, Milton and Knox were of the same opinion, and Jeremy Taylor says: "The effect of which consideration is this: that the Lord's day did not succeed in the place of the Sabbath; but the Sabbath was wholly abrogated and the Lord's day was merely of *ecclesiastical institution*."

Paley, Arnold of Rugby, Archbishop Whately and our great lawgiver hold the same language. Penn says: "To call any day of the week a *Christian Sabbath* is not *Christian* but *Jewish*; give us one Scripture for it; I will give two against it."

Bishop White, the chaplain to Congress during the Revolution, and the senior bishop of the Protestant Episcopal Church in the United States of America, in his Lectures on the Catechism, p. 64, speaking of the fourth commandment, says: "In regard to its duration, it appears evident that as far as regarded the authority of the injunction to the Israelites, and unless some new obligation can be shown, the institution ceased even in relation to Jewish converts to Christianity at the destruction of their religious polity; *and that it never extended to the Gentile Christians.* Of this there shall be given but one proof; it being decisive to the point. It is in the second chapter of the Epistle to the Colossians: 'Let no man, therefore, judge you in meat, or in drink, or in respect of an holy-day, or of the new moon, or of the Sabbath days.' Here the Sabbath is considered as falling with the whole body of the ritual law of Moses, and this may show the reason on which our church avoids the calling of her day of public worship—'The Sabbath.' It is never so called in the New Testament.' And in the primitive church the term

[Sparhawk *v.* Union Passenger Railway Co.]

' Sabbatizing' carried with it the reproach of a leaning to the abrogated observances of the law.'

The late Rev. Dr. James W. Alexander, a very distinguished divine of the Presbyterian Church, writing from New York, says, " The question of riding in our street cars on Sunday is agitating our community. I have not been able to decide it. THE POOR GO IN CARS, THE RICH IN COACHES. The number of horses and men is less than if there were no cars. It is a query, whether as many cars as would be demanded by those (among half a million), who have lawful occasion to journey. If so, the whole question would be reduced to one of individual vocation to this amount of locomotion. The whole matter of the Christian Sabbath is a little perplexed to my mind. 1st. All that our Lord says on it is *primâ facie* on the side of relaxation. 2d. The Apostles who enforce, and, as it were, re-enact every other commandment of the ten, never advert to this. 3d. Even to Gentile converts they lay no stress on this, which might be expected to come first among externals. 4th. According to the letter Paul teaches the Colossians (xi., 16) not to be scrupulous about Sabbaths. I am not, therefore, surprised, Calvin had doubts on the subject. I must wait for more light."

To the young man whom he directed to keep the commandments, if he would enter into eternal life, and who asked him, " Which ?" " Jesus said, Thou shalt do no murder ; thou shalt not commit adultery ; thou shalt not steal ; thou shalt not bear false witness ; honor thy father and thy mother, and thou shalt love thy neighbor as thyself," is a strong corroboration of the second reason above given by Dr. Alexander.

The Sabbath of the fourth commandment being abrogated and abolished, our Saviour did not command the observance of Sunday, nor is it alleged that there is any express direction to observe it by any of the Apostles to be found in the New Testament.

That Sunday (*dies solis*) grew up by usage among the primitive Christians as a stated day of prayer, and was recognised as such in the time of Justin Martyr, is certain. But it was clearly not a Sabbath in the Jewish sense, for the division into weeks was not recognised in the Roman world until the third and fourth centuries, and all Christians who were slaves, could not have obliged their heathen masters to give them one day in seven, for an entire rest from all labor.

So, from Pliny's letter to the Emperor Trajan, it would appear, the primitive Christians met before it was light, for worship and prayer, which was obviously adopted that it might not interrupt the labors or occupations of the day, a large portion of these early disciples belonging to the servile and laboring classes.

When Christianity became the religion of the emperor, and of

[Sparhawk *v.* Union Passenger Railway Co.]

course of the state, we find the division into weeks used, and the days called by the planetary names, as *dies solis* (day of the sun), *dies lunæ* (day of the moon), &c. In A. D. 321 the Emperor Constantine the Great, in the exercise of his civil authority, ordained as follows : " Let all judges and people of the town rest, and all the various trades be suspended, on the venerable day of the sun (*venerabili die solis*). Those who live in the country, however, may freely and without fault attend to the cultivation of their fields (since it often happens that no other day may be so suitable for sowing grain and planting the vine), lest, with the loss of favorable opportunity, the commodities offered by Divine Providence should be destroyed."

The act for keeping holidays and fast-days of the 5th and 6th Edward the 6th, chap. 3 (1552), is framed upon the same principle as the edict of Constantine, and speaking of the days appointed for the worship of God, which are called Holy Days, says this, " not for the matter and nature, either of the time or day ;" " for so all days and times considered are God's creatures, and all of like holiness. Neither is it to be thought that there is any certain time or definite number of days prescribed in holy scripture, but that the appointment, both of the time and also the number of days is left by the authority of God's word to the liberty of Christ's Church, to be determined and assigned, orderly in every country, by *the discretion of the rulers and ministers thereof*, as they shall judge most expedient to the true setting forth of God's glory and the edification of their people." Then follow the holy days to be kept, " all Sundays in the year." These are festivals.

By the 6th section, it is provided, " That it shall be lawful to every husbandman, laborer, fisherman, and to all and every other person or persons, of what estate, degree or condition he or they be, upon the holy days aforesaid, in harvests or at any other time in the year when necessity shall require, to labor, ride, fish or work any kind of work, at their free will and pleasure, anything in this act to the contrary notwithstanding."

In Swann *v.* Broome, 3 Burr. 1595, it was decided that Sunday was *dies non juridicus*, and Lord Mansfield says, " Anciently the courts of justice did sit on Sunday. The fact of this, and the reasons of it, appear in Sir Henry Spellman's original of the terms."

" It appears, by what he says, that the ancient Christians practised this. In his chapter of law-days among the first Christians, using all days alike, he says, ' The Christians at first used all days alike for hearing of causes, not sparing (as it seemeth) the Sunday itself.' They had two reasons for it. One was in opposition to the heathens, who were superstitious about the observation of days and times, conceiving some to be ominous and

unlucky, and others to be lucky; and therefore the Christians laid aside all observance of days; a second reason they also had, which was by keeping their own courts *always open*, to prevent Christian suitors from resorting to the heathen courts.

"But in the year 517, a *canon* was made, ' *Quod nullus episcopus vel infra positus die dominico causas judicare præsumat.*' And this canon, for exempting Sundays, was ratified in the time of *Theodosius*, who fortified it with an imperial constitution. ' *Solis die (quem dominicum recte dixere majores) omnium omnino litium et negotiorum quiescat intentio.*' The whole canon is also decreed *verbatim* in the capitulars of the Emperors Carolus and Ludovicus."

Lord Mansfield then cites several other subsequent canons, and says, "These canons were received and adopted by our Saxon kings." He cites also a constitution of Edward the Confessor, and continues, "These canons and constitutions were all confirmed by William the Conqueror and Henry the Second, and so became part of the common law of England."

As to the observation, "That the courts of justice never have been restrained, by Act of Parliament, from sitting on Sundays, and that the 29th of Car. 2, c. 7, does not extend to giving judgments."

"It was needless to restrain them from it by Acts of Parliament. They could not do it by the canons anciently received and made a part of the law of the land; and, therefore, the restraining them from it by Act of Parliament would have been merely *nugatory*. But fairs, markets, sports and pastimes were not unlawful to be holden and used on *Sundays* at common law; and therefore it was requisite to enact particular statutes to prohibit the use and exercise of them upon *Sundays*, as there was nothing else that could hinder them being continued in use."

In Mackalley's Case, 9 Co., it was " Resolved, That no judicial act ought to be done on that day; but ministerial acts may be lawfully executed on the Sunday." These cases are distinctly affirmed in Huidekoper *v.* Cotton, 3 Watts 59; Kepner *v.* Keefer, 6 Id. 231; Fox *v.* Mensch, 3 W. & S. 444.

It is clear, therefore, that in England, Sunday, or the Lord's day, was considered an ecclesiastical institution, and the only common-law restraint imposed upon it, as an observance of the day, was that no judicial proceedings should be had on Sunday, and that courts should not sit on that day.

In early times Parliament sat on Sunday; for in the reign of Edward the First, in 1278 and 1305, three statutes were made on Sunday, and Froude, in his first vol. of the History of Henry the Eighth, p. 67, speaking of the English archery, says, " Every hamlet had its pair of butts, and on Sundays and holidays all

[Sparhawk v. Union Passenger Railway Co.]

able-bodied men were required to appear in the field, to employ their leisure hours 'as valyant Englishmen ought to do,' utterly leaving the play at the bowls, quoits, dice, kails, and other unthrifty games. On the same days the tilt-yard, at the hall or castle, was thrown open, and the young men of rank amused themselves with similar exercises."

By the Act of 3 & 4 William 4, ch. 31, reciting that the profanation of the Lord's day is greatly increased by certain meetings, which are usually or occasionally held on that day, it enacts that all such meetings of corporations, vestries and public companies, and every other meeting of a public and secular nature required to be held on any Lord's day, shall be held on the preceding Saturday or succeeding Monday.

It is therefore evident that the Lord's day was considered like any other day, to be subject to regulation by the civil authority alone, who could, if it were deemed expedient and necessary, authorize the courts to sit on Sunday, notwithstanding the common-law prohibition.

By the Act of the 29 Charles 2, ch. 7, for the better observance of the Lord's day, commonly called Sunday, no tradesman, artificer, workman, laborer or other person whatsoever, shall do or exercise any worldly labor or work of their ordinary callings, upon the Lord's day or any part thereof (works of necessity and charity only excepted), "under a penalty of five shillings."

Under this statute, it has been held, a sale of a horse was not void, such sale not being made in the ordinary calling of the plaintiff or his agent, so a contract of hiring made on a Sunday between a farmer and a laborer for a year is valid, and the enlistment of a soldier by a recruiting officer is not within the statute. The words "other person or persons" do not include the owner or driver of a stage-coach, and, therefore, their contracts to carry passengers on a Sunday are binding; so an attorney entering into an agreement on Sunday for the settlement of his client's affairs, and thereby rendering himself personally liable, is not thereby exercising his usual calling; and the penalty can only be incurred once on the same day. So a farmer engaged in haymaking on Sunday is not within the statute; nor are railways. "The statutes clearly do not apply to railway companies, so as to render it illegal for them to run trains for the conveyance of goods or passengers on a Sunday:" Chitty on Carriers 117.

Such was the law of England at the foundation of the Province of Pennsylvania by William Penn, for although railways were not in existence, stage-coaches were, in 1658, in Cromwell's time. Penn's views on the subject of Sunday are to be found in his works and those of Barclay, and were the views of the Society of Friends, who were the early colonists. In the laws agreed upon in England expression is given to them in the 36th law;

" That according to the good example of the primitive Christians, and for the ease of the creation, every first day of the week, called the Lord's day, people shall abstain from their common daily labor, that they may the better dispose themselves to worship God, according to their understandings."

In the great law passed at Chester, in December 1682, we find this declaration as to liberty of conscience: " Nor shall he or she at any time be compelled to frequent or maintain any religious worship, place or ministry whatever, contrary to his or her mind, but shall freely and fully enjoy his or her Christian liberty in that respect without any interruption or reflexion.

" But to the end that looseness, irreligion and atheism may not creep in under pretence of conscience in this Province, ' Be it further enacted,' that according to the example of the primitive Christians, and for the ease of the creation, every first day of the week, called the Lord's day, people shall abstain from their usual and common toil and labor. That, whether masters, parents, children or servants, they may the better dispose themselves to read the Scriptures of truth at home, or to frequent such meetings of religious worship abroad as may best suit their respective persuasions."

With all Penn's liberality, we find by Janney's life of him, he was strictly orthodox in his own belief: p. 575.

It is certain also that he agreed with Luther and Calvin, and the statute of Edward 6th, as to the institution of the Lord's day, and that the mode of observance of it should be prescribed by the civil authority.

In 1705 was passed the act to restrain people from labor on the first day of the week, which is copied *verbatim* from the English statute, in the prohibitory part of the first section to which a penalty is attached, and is therefore to be construed in the same way, which would not have brought either stage-coaches or railways, if they had been in existence, within the act.

This remained the law until the 30th of March 1779, when an act for the suppression of vice and immorality was passed, by the 2d section of which it was enacted, " That if any person shall do any kind of work of his or her ordinary calling, or follow or do any worldly employment or business whatsoever on the Lord's day, commonly called Sunday (works of necessity and mercy only excepted)," he should be fined.

This act not having been enforced, and the fine, being payable in depreciated currency, having become less than a shilling in specie currency, another act was passed on the 25th September 1786, forbidding under a penalty any person doing or performing any worldly employment or business whatsoever on the Lord's day, commonly called Sunday (works of necessity and charity only excepted).

[Sparhawk *v.* Union Passenger Railway Co.]

" Provided always, that nothing in this act contained, shall be construed to prohibit the dressing of victuals in private families, bake-houses or in lodging-houses, wine and other houses of entertainment for the use of sojourners, travellers or strangers, or to hinder watermen from landing their passengers, or stage-coaches or stage-wagons from carrying travellers (having the consent of a justice of the peace upon extraordinary occasions), on the Lord's day, commonly called Sunday, nor to the delivery of milk, or other necessaries of life, before nine o'clock in the forenoon, nor after five of the clock in the afternoon of the same day."

Then came the Act of the 22d of April 1794, which was passed the year after the yellow fever had devastated our city, and which is the existing law. The first section enacts that, " if any person shall do or perform any worldly employment or business whatsoever on the Lord's day, commonly called Sunday (works of necessity and charity only excepted), he shall for every such offence forfeit and pay four dollars."

It will be observed that the Act of 1682 contained no penalty, which was, however, supplied by the Act of 1700; but the Act of 1705, like the statute of Car. 2, did not apply to stage-coaches or to travellers by public conveyances, and this was the wise and liberal law of the province under which grew up the usages mentioned by C. J. Lowrie, in Commonwealth *v.* Nesbit, 10 Casey 398, and which would be illegal under a strict construction of the Act of 1794. In 1779 and 1786 the language was changed, and this accounts for the exception of stage-coaches in the proviso of the last-named act.

The cardinal error in Johnston *v.* Commonwealth, 10 Harris 109, in the omnibus case, is in treating Sunday as set apart by divine command, and from the whole decision two judges, two-fifths of the court, dissented in opinions of very great weight and force; and the error in Commonwealth *v.* Nesbit, 10 Casey 398, was in assuming, that usages which were considered exceptions, had grown up under laws of a similar character, which we have seen was not the case, instead of treating them as works of necessity, which they clearly are.

Judge Bell, in Specht *v.* Commonwealth, 8 Barr 325, puts the Sunday law on its true basis: " Its sole mission is to inculcate a temporary weekly cessation from labor, but it adds not to this requirement any religious obligation."

I shall therefore treat the case before us as one within the exceptions of necessity and charity. Before doing so, it will be proper to consider the history of this prohibitory law. With us it binds all persons, whether Israelites or Seventh-day Christians. In Maine, Massachusetts, Connecticut, New York and Ohio, persons who conscientiously believe and keep the seventh day as

holy time, may do secular work and labor on Sunday, provided they disturb no other persons; and in Connecticut the prohibition to do any work is limited to that portion of the day between the rising of the sun and the setting of the same. Our very illiberrality should make us more desirous to extend the limits of necessity and charity, and not to confine them within narrow boundaries in this age of improvement.

After another season of pestilence, the legislature, on the 4th April 1798, passed an act to prevent the disturbance of religious societies in the city of Philadelphia during the time of divine service, which, after reciting the Act of the 6th February 1731, relating to religious societies, and stating that they had purchased lots and erected churches, and other houses of religious worship, and that by the constitution of this Commonwealth it is declared " that all men have a natural and indefeasible right to worship Almighty God according to the dictates of their conscience:" " And whereas, it would be nugatory to grant the said rights without securing the peaceable and quiet enjoyment of them:" it then enacted that the religious societies aforesaid were each authorized by a suitable person " to extend and fasten so many chains across the streets, lanes or alleys," as may be sufficient " *to hinder and obstruct* all coaches, coachees, chariots, chaises, wagons and other carriages whatsoever, and all and every person or persons, riding or travelling on horseback, from passing by the said churches or houses of religious worship during the time of divine service therein." They were only to be extended across the streets on Sundays, nor then until the commencement of divine service within said churches, said chains to be taken down before dusk and immediately after divine service is ended in the same.

The iron sockets in which the posts were fixed to which the chains were attached, are still to be seen opposite some of the old churches. In 1816, this act was extended to the incorporated district of the Northern Liberties, and both acts were repealed in 1831, showing that the public were convinced that the passage of these vehicles and horses, neither disturbed the congregations during divine service, nor injured the property, or decreased the value of the churches.

Shortly after this, railroads, with steam as a propelling power, were in operation in this state, and particularly the Columbia and Harrisburg roads, forming a through route from Philadelphia to Harrisburg; and in 1846 the Pennsylvania Railroad was incorporated, and in 1849 had nearly reached Hollidaysburg, where it was to connect with the Portage Road. On the 14th of November 1849 the board of directors passed the following resolution: " Resolved, That the general superintendent be instructed to discontinue, from and after the 31st December next, all operations

on the road on the Sabbath, and to make at his earliest conveni ence such general arrangements as may be necessary to relieve all persons in the service of the company from duty on that day." At the annual meeting of the stockholders on the 3d December 1849, Mr. Joseph R. Ingersoll offered a resolution stating that the above resolution of the directors " has the entire concurrence and approbation of this meeting, and that the directors are entitled to the especial thanks of their constituents for having vindicated the law of the land and the sanctity of the Christian Sabbath."

This resolution, with others, was referred to a committee of five, of which Mr. Ingersoll was the chairman, to report at an adjourned meeting on the 24th December.    At this meeting the committee made an elaborate report, and reported back the resolution for adoption, and it was accordingly adopted by the meeting.

These proceedings are all to be found in the Third Annual Report of the company, but what followed is not in print, nor is there any allusion to them in the Fourth Annual Report.

On the 11th March 1850, at an adjourned general meeting, the following resolution was offered :—

" Resolved, as the sense of this meeting, that the said resolution was premature, and should be forthwith rescinded."

And on the 19th March the operation of the resolution of the 14th November 1849, was suspended until the further action of the stockholders.  In pursuance of a resolution of the 19th March, polls were opened on the 25th March and closed on the 29th April, making 31 voting days, and the result was :

1125 stockholders voted 17,882 shares for Daily Lines,

704 stockholders voted 12,663 shares against Daily Lines, giving a majority of 421 stockholders and 5159 shares for Daily Lines, and this has been the uniform practice for seventeen years and upwards, and, so far as I know, is the invariable practice of all the railroads in Pennsylvania, and I know it to be so on all railroads running into Philadelphia and Pittsburg.

At the meeting of the 19th March, the late John B. Myers offered the resolution restoring the lines on Sunday, and I seconded it, and it was supported by Colonel James Page and other prominent citizens, and opposed by Mr. Ingersoll and others.  The discussion was thorough and ample, and, although the city was a very large stockholder, her vote was not cast at all, but it was decided by the votes of the individual stockholders.  The propriety and legality of this decision, giving back to the public one-seventh part of the year, I have never heard questioned, and the clergy and laity have profited largely by it.  In Pittsburg, where many of its citizens, including clergymen, reside in the country on the lines of the railroads, the Pennsylvania Railroad, several years ago, at the urgent solicitation of these persons, including

judges of the local courts, established what is called the *church train*, beginning with a few passengers, and growing up to its present magnitude. In the Pittsburg Legal Journal, and in all the Pittsburg papers, you find this advertisement of the Pennsylvania Railroad:—

### "THIRTEEN DAILY TRAINS.

#### "SUNDAY TRAINS.

"The Church Train leaves Wall's Station every Sunday at 9.15 A. M. and arrives in Pittsburg at 10.05 A. M. Returning, leaves Pittsburg at 12.50 P. M., and arrives at Wall's Station at 2 P. M."

The Pittsburg, Columbus and Cincinnati Railroad, Pan Handle route ; the Allegheny Valley Railroad ; the Western Pennsylvania Railroad, and the Pittsburg and Connellsville Railroad, all advertise and run similar Sunday church trains, and the Fort Wayne and Chicago Road have one train arriving, and one leaving, every Sunday during church time. The same is true as to the running of trains on Sundays on all the roads running into Philadelphia. The Pennsylvania, West Chester, Philadelphia Wilmington and Baltimore, the Reading, North Pennsylvania and Philadelphia and Trenton Railroads, all run trains on Sunday. The Germantown and Norristown run twenty trains on Sunday, and the Market Street Passenger Railway carries passengers to and from the Pennsylvania and West Chester Railroads on that day. All these are publicly advertised, and have been used for years, and no man, however religious, has ever refused to use them, or has ever attempted to have them stopped.

The editor of the Press, in a letter from London of the 18th August, and published in that paper of the 5th September last, uses this language :—

"This, a warm Sunday in London, is probably a very hot one in Philadelphia, and I cannot help thinking of the hundreds and thousands of my fellow-creatures at home still cruelly deprived of those facilities of cheap and pleasant travel enjoyed in every other city of our own and foreign countries. I will not cite the profligate example of Paris, where the Sabbath is a day of revelry instead of rest, nor even of those continental capitals which have no higher ambition than to imitate Paris. But if any stronger argument were asked than the simple fact that the population of Philadelphia would be immensely benefited by the enjoyment of these facilities, let us take the example of London.

"All these churches were crowded, and the great body of the worshippers had reached them by omnibus and the underground railroad. These lines run regularly and always full, the only exceptions being that the railroads stop from eleven A. M. to one P. M., or during divine service. You will recollect that while we were imploring the courts and the legislature of Pennsylvania to

[Sparhawk *v.* Union Passenger Railway Co.]

allow the cars to run on the city railroads on Sunday, it was proposed to suspend travel during church hours, but nothing could induce the over-pious opposition to yield. The underground railroad company issue tickets for the use of the working classes at one shilling, or twenty-five cents *a week*, including Sundays, which entitle one person to a daily ride to and from his home. The effect has been to provide cheaper lodging-houses for the laboring people on the outskirts of the city, and of course to improve the general health, by breaking up those close and filthy 'stews' and 'mews,' where so many have suffered and pined away in former years. If Sunday travel were stopped in London it would breed a riot. The most earnest protests would come from the dissenters and their great preachers, Hall, Spurgeon, Binney and Conway, whose immense tabernacles would be empty in bad weather, and hundreds prevented from hearing the Word of that God, who never designed that his creatures should be denied light and air on the Sabbath day. When I told one of the dissenting leaders that Philadelphia, with streets seven and eight miles long, leading from below the Navy Yard to beyond Richmond, had neither omnibuses nor railroad cars for public use on Sunday, he was amazed; and when I added, that for advocating the use of these indispensable conveniences on that day, I was denounced by a number of clergymen, most of them Presbyterians, he said that they took an odd way of showing their Christianity. 'Why, sir,' he said, 'if the poor people of London could not ride out on Sunday, there would be twenty funerals where there is now but one.' The underground railroad is the poor man's preferred conveyance; and it is a most profitable improvement."

In England the railroads are *not compelled* to run on Sundays, but whenever they do, they are obliged to provide a cheap train also, which shall stop at all the usual stations, so as to accommodate poor persons. Some sixteen years ago, the directors of the railway between Glasgow and Edinburgh stopped the Sunday train, except the mail car, which they were obliged to run to carry the mail. This road has been lately purchased by the North British Railway Company, who have resumed the Sunday trains, much to the comfort of the people. It is not astonishing that the Scottish clergy, who are all of one denomination, should be very strict in their Sunday observances, when it was thought improper to walk on Sunday afternoon, after divine service, for recreation, and when in some parts of Scotland, a clergyman cannot shave himself on Sunday morning, because it is an infraction of the fourth commandment, "In it thou shalt do no manner of work."[1]

All other modes of passing from one part of the state to ano-

---

[1] In 1658, the Presbytery of Strathbogie condemned an offender accused of Sabbath-breaking for saving the life of a sheep.

[Sparhawk *v.* Union Passenger Railway Co.]

ther are extinguished, and travelling by private conveyance no longer exists. If the Sunday prohibition extends to railroads, then no errand of mercy, at any distance from the city, can ever be accomplished on that day. I have had a personal experience of the value of Sunday trains; for on a Sunday I was enabled to take a most distinguished physician, who could not leave the city on any other day, to see a sick sister, at thirty miles distant, leaving after breakfast and returning before dinner.

I have therefore no hesitation in saying, that I consider Sunday trains as coming within the exceptions of necessity and charity.

The Commonwealth *v.* Nesbit was decided in the autumn of 1859, eight years ago, and Chief Justice Lowrie said : " The law regards that as necessary, which the common sense of the country, in its ordinary modes of doing its business, regards as necessary." " By this test, iron and glass are necessaries of life, and they cannot be obtained without some work being done on Sundays, if the business is to be performed according to the ordinary skill and science of the country. The law never inquires whether iron and glass generally, or in such large quantities, are really necessary, in the strictest sense of the word, or whether it is not possible to improve the art, so that Sunday may not need to be violated. This is not the province of law, but of individual enterprise and science. Law, therefore, does not condemn those employments which society regards as necessary, even when they encroach on the Sabbath, if according to the ordinary skill of the business it is necessary to do so; and then, the business being recognised as necessary, it may be performed by means of the services of others, and by all the ordinary means of the business, as far as it is necessary." So, he considers the business of keeping a livery stable is a necessary employment in large towns, and this includes the hiring out of horses and carriages on every day of the week. So, you must bring the Monday's issue of every daily paper within the exception, for the types are set, and all the work is done on Sunday, whilst on a Sunday paper, all the work is done on Saturday.

There are now four passenger railways in Pittsburg, operating seventeen miles of road, and passing in front of churches of every sect and denomination, and all running on Sunday, and used and patronized by divines, judges, and all the religious persons in the community. They have met with universal approbation, and the Sunday cars have become a matter of absolute necessity in taking persons to and from church, and have conduced greatly to the peace and quiet of the city and suburbs.

This is the universal belief, and I know it to be correct, having frequently ridden in them on Sunday.

Sunday cars are used in Boston, New York, Albany, Troy and

[Sparhawk *v.* Union Passenger Railway Co.]

Brooklyn, in Hoboken and Jersey City in New Jersey, Baltimore, Nashville, Cincinnati, Washington, St. Louis and Chicago, and give universal satisfaction. Within the last ten years, 167 miles of passenger railway have been built and worked in this city, which have entirely superseded the omnibuses, which had numbered 400, and have virtually dispensed with all other means of general locomotion in this city.

At the time of the passage of the Sunday law, the population of the city of Philadelphia was under 30,000, and we now have within the corporate limits a population nearly double that of the whole state in 1790, when Pittsburg had but 1200 souls, and the county of Erie was not the property of the Commonwealth. Some of the vehicles named in the Act of 1798, are now known only by tradition, and an entire and radical change has taken place in the means of locomotion accommodated to a municipality of 130 square miles in area, with 100,000 dwellings, and with streets extending miles in length, and many of them separated by a navigable stream, which increases the difficulty of passing from one part of the city to another.

In 1794 we had no waterworks, no iron pipes, no steamboats, no canals, no railroads, no gas, no telegraph, no Atlantic cable, and only one stone turnpike—all of which are matters of indispensable necessity, and coming clearly within the necessity exception of the Sunday law.

In 1856 the first passenger railway was chartered. The passenger railways to-day, in the short period of eleven years, traverse nearly every portion of the city, and pass over the Schuylkill by the bridges at Chestnut and Market streets, at Fairmount and Girard Avenue. The rails laid are broad, and accommodate all vehicles, whether for pleasure or burden, with a smooth surface, diminishing greatly the noise and the labor of the horses. To an invalid, nothing can be more grateful than to escape from the cobblestones, and to ride on the railway track. It has been decided that no person can claim damages from a company whose road passes on a street in front of his property. These passenger railways are therefore legal institutions, and the owners of the tracks laid on the streets subject to a modified user by the public. Workmen and laboring men are enabled by these railways to work a long way from their homes without the fatigue of walking long distances, and the consequent loss of time ; men of business, old persons, invalids, women and children, are enabled to ride on their different errands at a small expense. Our city spreads out in every direction, because distances are in fact annihilated by the passenger railways.

The stoppage of these railways would utterly derange the whole business of the city, reduce the value of all property, and entirely destroy the present prosperous condition of our metropolis. The

4 P. F. Smith—29

railways are therefore an absolute necessity, and are clearly within the exception of the statute. These railways are in operation a very large portion of the twenty-four hours, and in some instances every hour of the twenty-four. Their necessity in cold, wind, rain, hail, sleet and snow, and in the heats of midsummer, all acknowledge.

Most of the plaintiffs, if not all, have places of business on streets where passenger-cars are passing every few minutes, and no one has complained that they have ever interfered with his addition of items in a bill, in his correspondence with his customers, or the details of his trade or occupation. Clergymen and religious persons have family worship on week days, and meetings for religious worship are held on various days besides Sundays, but I have never heard that the cars disturbed them or interfered with the prayers put up by pious men on every day in the year in their own dwellings, except in the single case of Sunday. People sleep whilst the cars are running, and no one complains of them as a nuisance.

The greatest nuisance is the driving up of carriages during the sermon to take home at the close of the service the rich members of the congregation. There are two services a day, occupying two hours in the morning, and two hours in the afternoon, say four hours out of the twenty-four, and to protect these four hours we are asked to enjoin the whole day.

When there is no religious worship, a church experiences no inconvenience, and its complaint is like that of an owner of an uninhabited dwelling, and entitled to no more consideration. It is certain that a railway-car, rolling over a smooth iron rail, occasions no more real noise than a wagon or a carriage driven smartly over a cobblestone pavement.

It is to be recollected that this noise of the rolling of the cars is legal, and authorized by Acts of Assembly, and therefore it is *damnum absque injuria*, and it clearly is not such an annoyance " as materially to interfere with the ordinary comfort of human existence," and neither of the plaintiffs could obtain *any damages*, much less substantial damages at law, so as to entitle him to an injunction: Crump *v.* Lambert, Law Rep. 3 Eq. 409.

As to disturbing persons in private dwellings on Sunday, it is an absurdity, which requires no answer. If, therefore, the churches, or rather the individual pewholders, have no right to complain, what right have these plaintiffs to deny others the right of locomotion, in order to force them to attend church in the very teeth of the constitutional provision, " That no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent."

Having established the absolute necessity, in the present state of our city, of passenger railways, and the utter impracticability

of doing without them, why should there be one day in seven in which that necessity must cease, and not operate? All that ceases on Sunday is common toil or labor, and the intention is to protect the laboring man, who earns his bread by the sweat of his brow. Besides worship and prayer, there are hours for healthful and innocent recreation. These are protected by the constitutional provision.

We have public squares and a great public park owned by our fellow-citizens, and intended for their benefit, and that of their wives and children. Clergymen, lawyers, physicians, merchants, and even judges, have six days in the week, in which they may enjoy all these and other similar advantages, and which they may do so cheaply by means of the passenger railways. The laboring man, the mechanic, the artisan, has but one day in which he can rest, can dress himself and his family in their comfortable Sunday clothes, attend church, and then take healthful exercise; but, by this injunction, his carriage—*the poor man's carriage, the passenger car*—is taken away, and is not permitted to run for his accommodation. The laboring man and his children are never allowed to see Fairmount Park, a part of his own property.

The cars are required on Sunday to carry persons to and from church, and are not these church-going people entitled to have them? The necessity for this clearly exists on Sunday, and so it does enable persons to partake of the fresh air in the squares and parks and in the country.

But we should not oblige the working man to confine himself to his own narrow, stifling room, and forbid him to enjoy the fresh air of heaven. We have three long months of summer which the laboring man cannot escape. Merchants, manufacturers, lawyers, judges and physicians run away from them, and even clergymen leave their churches, and go to the sea-shore or to the mountains, to avoid the torrid months of July and August. Shall not the operative have the poor privilege allowed him of a passenger car on Sunday?

The same necessity exists on Sunday as on any other day, enhanced by the fact, that you are preventing thousands from attending houses of religious worship.

I place my opinion, therefore, of the entire legality of running passenger cars on Sunday, on the same footing with the Sunday trains of the steam railroads, as being clearly within the exceptions both of necessity and charity. The mail protects nothing but the mail-car on the steam railroads, and many of the trains carry no mail at all.

If I conceded the illegality, still it would be clear to me that these plaintiffs have no standing in this court, and no right to ask for any injunction against these defendants. It is a matter for the Commonwealth alone, " and she has her own chosen officers to

[Sparhawk *v.* Union Passenger Railway Co.]

protect her own rights, and the rights of the whole community are what constitute public rights, or the rights of the Commonwealth."

I am deeply impressed with the necessity of a proper observance of Sunday as a day of worship and prayer, and of rest from labor; but living under the new dispensation, and not under the old dispensation, I feel no inclination to turn the Lord's day into a *Jewish Sabbath*.

The decrees in both cases should be reversed.[1]

STRONG and AGNEW, JJ., dissented.

---

The opinion of the court in Kenton *v.* The Union Passenger Railway Company was delivered at Pittsburg, November 7th 1867, by

WOODWARD, C. J.—Concurring generally in the conclusions stated by my brother Thompson in the foregoing cases, I strongly inclined at the first to the opinion that a different result must be reached in this case, on the ground that whilst Sparhawk and his co-plaintiffs had not shown any such equitable right as entitled them to an injunction to restrain Sunday cars, a stockholder of the company might well demand our interposition to restrain his company from wanton violation of a statute of the Commonwealth. It seemed to me that the visitorial power vested in this court by the Equity Act of June 16th 1836 (Purd. 401), to supervise and control corporations other than municipal corporations, would require us to restrain any private corporation from an habitual violation of statute law, at the suit of a stockholder of such corporation, for the power was conferred on us, to be exercised in proper cases, and a stockholder of the offending corporation would seem to be the most proper person to call this power into exercise.

In Manderson *v.* The Commercial Bank, 4 Casey 379, we held that a stockholder in a bank is entitled to injunction to restrain its officers from the continued commission of acts which are contrary to law and may endanger its charter, where, upon affidavits exhibited on both sides, the truth of the charges is left in doubt. It was there said that under such circumstances the awarding of an injunction can do no injury, and only gives the stockholders a proper measure of protection. Now Kenton complains, in his bill, that he is a stockholder in The Union Passenger Railway Company of Philadelphia; that the defendants have recently engaged in the business of running cars and carrying passengers for

---

[1] NOTE.—*Sunday.*—Dies solis—Dies Dominica—The Lord's Day.

*Saturday.*—Dies Sabbati—Sabaday, *Norman French;* Sabado, *Spanish;* Sabbato, *Italian;* Sabado Da Gloria, Holy Saturday in *Mexico;* Sabbatum, *Latin.*

[Sparhawk *v.* Union Passenger Railway Co.]

hire on and over their said railway, in the city of Philadelphia, on the first day of the week, commonly called Sunday, in violation of the laws of this Commonwealth; that they have taken from the government of the United States a contract to carry public mails in and through the city of Philadelphia, without lawful authority in their charter so to do; and that, by reason of said unlawful acts, the charter of said Union Passenger Railway Company has come to be imperilled, and that he, as a stockholder, is in danger of losing the value of his stock, and hence he prays for an injunction to restrain said illegal acts.

I am fully persuaded and do hold:—

1st. That running Sunday cars is worldly employment in violation of the Act of 22d of April 1794: Purd. 914.

2d. That it is not authorized by the charter of the incorporation defendant, and is *ultra vires.*

3d. That they have no authority by their charter to hold or execute a mail contract.

But, 4thly, whether these illegal acts constitute such abuse or misuse of the company's charter as to imperil its existence, is a question that can only be tried at the suit of the Commonwealth, which is not complaining, and therefore I conclude that the charter is in no present danger. Holding, however, as I do, that the acts complained of are clearly illegal, and that a stockholder, though not a mere private suitor like Sparhawk, may be admitted to sue for injunction, the question is, shall it be granted? Contrary to my first impressions I have come to the conclusion that it ought not to be granted, for the general reason that this is not a bonâ fide stockholder's bill, but only a bill in aid of the private bill of Sparhawk and his fellow plaintiffs. I find in the answer of the company to Kenton's bill that they allege that he bought his five shares of stock after they had made their contract with the post-office department, and after they had begun to run their cars on Sunday, and with a full knowledge of said facts; that he had bought them not as a bonâ fide investment of the price thereof, but solely at the suggestion of Sparhawk and the other plaintiffs in the foregoing suit to enable him, the said Kenton, to file this bill as such alleged stockholder in aid of the said bill of Sparhawk and others, and for the same object; that said plaintiff purchased said shares for no other purpose or object whatever than so to use the same, and his ownership thereof, in support of the said Sparhawk and others in aid of their bill; that the plaintiff's stock is not now and never has been in any peril, as respondents believe; and said plaintiff is in no danger of losing the value of the same, and that the filing of said bill was not, in fact and in truth, for the purpose of protecting said stock, but for the purpose aforesaid of aiding and supporting the Sparhawk bill.

These very precise allegations are strictly responsive to the

[Sparhawk *v.* Union Passenger Railway Co.]

plaintiff's bill, for they put in issue the bona fides of his complaint as a stockholder. They amount in effect to a denial that it is a stockholder's bill at all that is presented to us, and they arraign the plaintiff as a litigious volunteer, buying himself into the company with a full knowledge of the wrongs of which he complains, and for the mere purpose of encouraging and supporting the litigation of other parties.

How are these weighty charges met by the plaintiff? No otherwise than by an argument of his counsel that his motives cannot be inquired into. If the allegations of the answer are responsive, as we think they are, they are to be taken as confessed in the pleadings.

It is not, then, a question of motives, but the question is, whether we should treat the bill as a stockholder's bill. A chancellor will always look to the genuineness of the character in which a party comes before him. A stockholder is bound to come with clean hands, with a sincere complaint, free from all false pretences as much as every other party who comes into a court of equity. Injunction is not of right but of grace, and to move an upright chancellor to interpose this strongest arm of the law he must have not a sham case but a well-grounded complaint, the bona fides of which is unquestioned, or capable of vindication, if questioned.

Such, I am obliged to think, is not the case now before us. It is so purely supplemental to the other case, so merely a shadow of that substance, that it would be absurd to grant the injunction to Kenton after denying it to Sparhawk. For the reasons given by Judge Thompson, I think the company's violation of the Sunday law can be redressed only by enforcing the statutory penalty, or by a proceeding on behalf of the Commonwealth against the company for misuse or abuse of their charter, and not by a proceeding in equity where the parties complaining have no other interest than that which is common to the whole community. And if such parties are not entitled to relief by injunction, much less is an adjutant of theirs who came a volunteer into the field of litigation and complains only of what he purchased for a price, with his eyes wide open. No bonâ fide stockholder of the company complains of their infractions of law, and conceiving that Kenton is not in the proper attitude to complain, I concur with those of my brethren, who for these reasons or for others, are for dismissing his bill.

> Decree reversed and plaintiff's bill dismissed at his costs.

Thompson and Read, JJ., concur in the conclusions at which the Chief Justice arrives in this case.

Strong, J., dissented.