## Burch et al. v. Sigourney Mellor et al.

598

*Henry A. Frye*, for plaintiffs.

*George V. Strong*, for defendants.

GORDON, JR., P. J., February 11, 1942.—This is a proceeding in equity brought by a group of attorneys constituting the membership of the Committee on the Unauthorized Practice of the Law of the Philadelphia Bar Association in their own behalf and on behalf of the association against defendants Sigourney Mellor and Edward Mellor, copartners, who are engaged in the business of selling insurance under the name of Sigourney Mellor & Company, to restrain defendants from using in connection with their business a certain advertisement claimed by plaintiffs to be violative of the Act of April 28, 1899, P. L. 117, and its amendment of April 24, 1933, P. L. 66. The act prohibits laymen from holding themselves out to the public by advertising or otherwise as practicing, or being entitled to practice, law. The controlling facts are not in dispute, and the

case has been submitted to us for decision on bill and answer. . . .

[The essential facts as found by the court were as follows:

The preparation of and advice concerning wills and trusts and the furnishing of advice concerning the legal incidents of and legal relationships between various types of life insurance policies and trusts and wills require legal training, knowledge, and skill.

Defendants, who were not qualified and entitled to practice law, had for many years been using a copyrighted advertisement as follows:

UNFINISHED BUSINESS
turned into
FINISHED BUSINESS
by
SIGOURNEY MELLOR & CO.
through
LIFE INSURANCE

———

TRUSTS

———

WILLS
WHAT WILL THE FUTURE
BRING TO PASS?

Whatever business of a legal nature may have been directed by the advertisement was, however, referred to regularly licensed attorneys, defendants never having themselves prepared trust indentures, wills, or other legal documents or papers, or given clients legal advice concerning such documents.]

### *Discussion*

As indicated in the foregoing answers to the requests for findings of fact, two questions are presented for our consideration: First, whether the advertisement amounts to a solicitation of legal business by defend-

ants and holding of themselves out to the public as being entitled to practice law with respect to matters involving trusts and wills; and, second, whether, if so, plaintiffs have shown a case entitling them to an injunction restraining further use of the advertisement by defendants. There is nothing in the pleadings to justify a finding that defendants have actually been practicing law, for, in the absence of contradictory evidence, we must accept as true the averments of the answer that they have not. This narrows the inquiry under the first question presented to a determination of the meaning of the advertisement itself. Does it solicit legal business in matters relating to trusts and wills, and represent defendants to the public as practitioners of law and lawfully entitled, or licensed, to sell their legal services to those whose business is solicited by it?

The Act of April 28, 1899, P. L. 117, as amended by the Act of April 24, 1933, P. L. 66, makes it unlawful for any person (partnership, etc.), not a regularly licensed attorney, ". . . to practice law, or to hold himself, . . . out to the public as being entitled to practice law, or use or advertise the title of lawyer, attorney-at-law, . . . or the equivalent in any language, in such manner as to convey the impression that he . . . is a practitioner of the law . . . , or, in any manner, to advertise that he . . . , either alone or together with another person or persons, has, owns, conducts, or maintains a law office . . . ."

Taking this language as a whole, it is the evident intention of the act to forbid the practice of law and the solicitation of legal business by laymen. Its primary purpose, however, is not to protect the profession from competition by laymen, but rather to protect the public from the injurious consequences of entrusting its legal affairs to ignorant and untrained persons, and to prevent its becoming the victim of such incompetence through reliance on false representations in advertise-

ments that the advertiser is a member of the bar duly accredited to the public by the courts as fit and qualified to render legal services. Defendants' contention, therefore, that their advertisement does not violate the act because it fails to disclose affirmatively that they are entitled to practice law is without merit. The holding out is there, implicit in the solicitation of the business, and, if false, is as much a fraudulent representation as that implied by the giving of a check on a bank in which the maker has no account. He who offers goods for sale, whether they be tangible or intangible, represents himself as at least not forbidden by law to deal in the merchandise he is selling. Were this not so, good business practices would soon lose their moral foundations, and the path of the cheater be made easy.

This being so, the question arises whether the language and form of the advertisement does, in effect, solicit legal business. In considering that question the assertions of defendants respecting what they intend by the words used, and the effect they seek to obtain through them, are not controlling. The advertisement must be interpreted in the light of the ordinarily accepted meaning of the words used, and the thought which the language employed fairly conveys to the reader of it. Were we to limit our interpretation to the declared intentions of the advertiser, the door would be thrown open to his secret accomplishment of the prohibited purpose after the customer had been lured by the advertisement to his office. The power of an advertisement frequently lies in what it implies and suggests rather than in what it actually says. Its very terseness constitutes its strength and its comprehensiveness. This is well illustrated in the following celebrated anecdote which Thomas Jefferson relates was told to him by Dr. Franklin at one of the sessions of the Continental Congress during the drafting of the Declaration of Independence:

"I was sitting by Dr. Franklin, who perceived that I was not insensible to these mutilations. 'I have made it a rule,' said he, 'whenever in my power, to avoid becoming the draughtsman of papers to be reviewed by a public body. I took my lesson from an incident which I will relate to you. When I was a journeyman printer, one of my companions, an apprentice hatter, having served out his time, was about to open shop for himself. His first concern was to have a handsome sign-board, with a proper inscription. He composed it in these words, "John Thompson, Hatter, makes and sells hats for ready money," with a figure of a hat subjoined; but he thought he would submit it to his friends for their amendments. The first he showed it to thought the word "Hatter" tautologous, because followed by the words "makes hats", which show he was a hatter. It was struck out. The next observed that the word "makes" might as well be omitted, because his customers would not care who made the hats. If good and to their mind, they would buy, by whomsoever made. He struck it out. A third said he thought the words "for ready money" were useless, as it was not the custom of the place to sell on credit. Every one who purchased expected to pay. They were parted with, and the inscription now stood, "John Thompson sells hats." "Sells hats!" says his next friend. Why nobody will expect you to give them away, what then is the use of that word? It was stricken out, and "hats" followed it, the rather as there was one painted on the board. So the inscription was reduced ultimately to "John Thompson" with the figure of a hat subjoined' ": The Writings of Thomas Jefferson (Library Ed.), vol. 18, p. 169.

Reading the advertisement before us then from this standpoint, it invites the public to bring its "unfinished business" (that is to say, the business of making financial provision for the future) to be "finished" by defendants "through" one or more of the methods specified, namely, the purchase of insurance, the creation of

a trust, or the preparation and making of a will. It certainly gives no warning to the prospective customer that he will not be able to conclude his business at defendants' office, but will have to go elsewhere and hire the services of a lawyer to do the real "finishing" job offered in the advertisement. The citizen who neither needs, nor desires, insurance, but who wishes to make a will, or place his property in trust for the benefit of himself or his family, would be as much attracted by the advertisement as the prospective purchaser of insurance. Indeed, it is as appropriate for use by the unethical practitioner who sells insurance on the side as by the insurance broker. And finally, defendants' assertion that, as they are only engaged in selling insurance, their use of the words "wills" and "trusts" is intended merely to indicate their purpose to advise their customers to seek the services of a lawyer in making suitable provision for the disposition of the proceeds of the insurance sold to them is a manifest subterfuge, especially when we consider that probably 95 percent of the life insurance policies sold are made payable to specifically named beneficiaries, as to whom no trust or will of the insured would be operative.

Defendants' advertisement being clearly a violation of the act, we come to a consideration of the second and final question in the case: namely, whether plaintiffs have shown a case entitling them to an enforcement of the act by injunctive relief. It is fundamental that equity is concerned only with the protection of property, and that, to invoke the aid of equity, a plaintiff must show an actual or threatened invasion of property rights. A court of chancery is without jurisdiction to restrain acts which, although illegal, involve merely wrongs to the person or violations of the Criminal Code: Sparhawk v. The Union Passenger Rwy. Co., 54 Pa. 401; Ashinsky v. Levenson, 256 Pa. 14; Kershes v. Verbicus et al., 36 D. & C. 499, 504; Miner et al. v.

Loomis et al., 25 D. & C. 275; Bispham's Principles of Equity, (10th ed.) chap. III, p. 58.

This being a well-settled rule of equity jurisdiction, it is clear that plaintiffs have failed to show any special damage to them in their property rights as licensed practicing attorneys. The fact that, if property rights are invaded or threatened, equity will not be ousted of its jurisdiction merely because the act may also be criminal, does not help plaintiffs here. They admit the averments of the answer that during the 14 years in which defendants have used the advertisement in question they have never actually practiced law, or intend to do so, in connection with the business coming to them through it. By this admission a case is presented in which it is affirmatively established that their professional property rights and interests neither have been actually involved, nor threatened, thus leaving the bare violation of the act as the only wrong committed by defendants; and for it the sole remedy is a prosecution under the penal provision of the act.

". . . it is a universally acknowledged principle that a court of equity has no jurisdiction in matters merely criminal or immoral. It leaves the correction of these matters to the criminal courts. The remedy at law by indictment and prosecution is presumed to be adequate, but if it is not so, the relief must come from the lawmaking power, and not from the courts. This rule which prevents a court of chancery from interfering with the administration of the criminal laws of the state is a wise one, founded on sound principles of public policy. Any other would result in much confusion and embarrassment in preserving peace and order and enforcing the police power of the state generally": 10 R. C. L. 341, §91.

Being of opinion, for the reasons indicated above, that plaintiffs are not entitled to equitable relief, notwithstanding the advertisement is manifestly in violation of the act, we reach the following

## Conclusions of law

1. The drafting of trusts and wills constitutes the practice of the law.

2. Furnishing advice concerning the relationship of insurance policies to trusts and wills intended to deal with practical problems constitutes the practice of the law.

3. Defendants, and each of them, in the advertising containing the words "Trusts-Wills" are holding themselves out to the public generally as qualified to give advice in the preparation of wills and trusts in violation of the law.

4. In the absence of a showing that defendants have practiced law in connection with customers attracted to them by the advertisement in question, or intend to do so, or that the property rights of plaintiffs as members of the bar and duly licensed and accredited practitioners of the law have been invaded, or are threatened with invasion and damage, a court of equity has no jurisdiction to restrain the publication and use of said advertisement by defendants at the suit of plaintiffs.

5. Plaintiffs are not entitled to the equitable remedy which they seek, and the bill should, therefore, be dismissed.

6. Each party should bear its own costs in the proceeding.

Accordingly we now enter the following

## Decree nisi

And now, to wit, February 11, 1942, this case having come on to be heard upon bill and answer, upon consideration thereof, it is ordered, adjudged, and decreed:

1. The bill is dismissed.

2. The parties shall bear their own costs in the proceeding.

The prothonotary will enter this decree nisi and give notice thereof to the parties or their attorneys and,

unless exceptions thereto are filed within 10 days, either party may present to the court a form of final decree to be entered in the case.